THE STATE v. WISDOM, *Appellant.*

Division Two, January 31, 1894.

1. **Criminal Practice**: EVIDENCE: DEFENDANT'S STATEMENT BEFORE THE CORONER.  Admissions of defendant before the coroner, are admissible for, but not conclusive on, the state, on a trial for murder.

2. ——: ——: ——: OBJECTIONS.  An alleged error in the admission in evidence of defendant's testimony given before the coroner will not be reviewed on appeal where the bill of exceptions shows that defendant's counsel simply said, "This goes in, of course, subject to our exception," but does not show an objection, an assignment of a reason for exclusion, or a ruling by the court.

3. ——: ——: ——,  Voluntary statements of defendant made before the coroner and statements which he requested the privilege of making are competent evidence against him.

4. **Criminal Practice**: DEFENDANT'S STATEMENTS.  All statements made by a defendant in relation to the homicide should be considered together.

5. ——: ——: INSTRUCTION.  An instruction as to the rule governing the jury in the consideration of defendant's statements approved.

6. ———: EVIDENCE: HARMLESS ERROR. Evidence that the defendant refused to touch the body of the deceased at the morgue at the request of a person who was prompted by the old superstition that the body would freshly bleed when touched by the murderer is immaterial; but its admission, not being prejudicial, will not constitute reversible error.

7. **Murder in First Degree**: VERDICT: EVIDENCE. The evidence in this case *held* sufficient to sustain the verdict of guilty of murder in the first degree.

*Appeal from St. Louis Criminal Court.*—HON. HENRY L. EDMUNDS, Judge.

AFFIRMED.

*Charles F. Krone* for appellant.

(1) The state having offered in evidence defendant's statement made before the coroner, thereby made him its own witness and could not afterwards impeach him. *Jones v. State,* 13 S. W. Rep. (Tex.) 990; *State v. Thomas,* 99 Mo. 235. (2) The statements made by defendant at the coroner's inquest were inadmissible. *State v. Lamb,* 28 Mo. 218; *State v. Bilansky,* 3 Minn. 246; *Alfred v. State,* 2 Swan (Tenn.), 581; *United States v. Darnand,* 3 Wall. Reports, 144; *United States v. Kirkwood,* 5 Utah, 127; *Southard v. Rexford,* 6 Cowen (N. Y.), 254. The court erred in instructing the jury that what defendant said against himself the law presumes to be true unless rebutted by other testimony, etc. There was no evidence on which to found the instruction or to which it could be applied. *State v. Jackson,* 95 Mo. 651; *State v. Green,* 13 Mo. 382; *Young v. State,* 68 Ala. 569; *Redd v. State,* 69 Ala. 255; *State v. Red,* 53 Iowa, 69; 3 Rice on Ev., p. 497, sec. 313; 1 Bishop on Crim. Proc. [3 Ed. 1880], sec. 1218; 2 Best on Evidence [Ed. 1878, Morgan's], secs. 523, 524. (3) The testimony that defendant refused at the morgue to lay his

hands on the body of the deceased was incompetent.
There was merely ·a conjectural connection, if any,
between the episode and the possible guilt of defendant.
Wills on Circum. Evid. [6 Ed.], 1881; Mill's Logic,
Bk. V, Ch. 2 and 3; Novum Organum, Lib. I,
Aphorisms, CV. 2. (4) Trial by ordeal is a thing of
the past. *Doyns v. Georgia*, 63 Ga. 699; *Stokes v.
State*, 5 Bax. (Tenn.) 619; *State v. Jacobs*, 5 Jones
(N. C.) 259; *Blackwell v. State*, 67 Ga. 76; 74 N. C.
646; 21 Am. Rep. 493; 33 *Ib.*, 540. (5) Further-
more, the order was an attempt to compel the defend-
ant to do an act for the purpose of making evidence in
a proceeding in which he was under' examination. He
declined to do that act when directed, and his refusal
was merely an exercise of his privilege as a witness on
trial or under examination. It certainly will not be
contended that this exercise of his privilege may
properly be adduced in evidence against him as a badge
of guilt, for then the attempt to compel him to testify
against himself would be indirectly successful; the
refusal of a defendant to testify would inevitably
redound to his injury and the value of his privilege be
destroyed. Art. & Amend. in Add. to Const. of the
U. S., art. 5; Const· art. 2, sec. 23; Cooley's Const.
Lim. [4 Ed.] 317, 389; *Nolen v. State*, 14 Tex. App.
474–484; 3 Am. & Eng. Encyclopedia of Law, p. 439,
note 3; *People v. McGungill*, 41 Cal. 429; *People v.
Tyler*, 36 Cal. 522; *Long v. State*, 56 Ind. 182; *State v.
Cameron*, 40 Vt. 555; *Com. v. Scott*, 123 Mass. 539;
*Com. v. Hadow*, 110 Mass. 411; *State v. Houghton*, 12
Nev.

*R. F. Walker*, Attorney General, and *C. O. Bishop*
for the state.

(1) The proposition that the state could not intro-
duce testimony of statements made by appellant tend-

ing to contradict his sworn testimony before the coroner (offered in evidence by the state), is wholly untenable. And the proposition that by introducing in evidence appellant's sworn testimony before the coroner the state made appellant her own witness, is preposterous. No such doctrine is declared (or hinted) in *State v. Thomas*, 99 Mo. 235. Nor is such a proposition supported by *Jones v. State*, 13 S. W. Rep. (Tex.) 990. (2) Nothing is better settled than that falsehoods and contradictions by the defendant as to the alleged offense and its circumstances, and prevarications on defendant's part when charged with the crime, are competent evidence against him. 1 Bish. Cr. Proc. [3 Ed.] sec. 1252; Wharton's Crim. Ev. [9 Ed.] sec. 751; *State v. Hayes*, 78 Mo. 307. (3) The sworn statements made by the appellant before the coroner were admissible in evidence against him, especially as it appeared that they were not only voluntarily made, but that he requested the privilege of making them. *State v. Mullins*, 101 Mo. 514. (4) Moreover, there was no objection on the part of the appellant to the introduction of the evidence. No exception shall be taken in an appeal or writ of error to any proceedings in the [circuit] court except such as shall have been especially decided by such court. R. S. 1889, sec. 2302. (5) The instruction as to "statements of defendant" is in nowise subject to the criticism of appellant. In the first place, the court did not use the word "admissions," but "statement or statements," and in the second place submitted to the jury the question of fact as to whether any such "statement or statements" were made. In this the court did not err, even though no statement had in fact been proven. *State v. Hopper*, 71 Mo. 425. But the instruction itself has been so often approved by this court, that it seems time wasted in arguing the point. *State v. West*, 69 Mo.

401; *State v. Curtis*, 70 Mo. 594; *State v. Peak*, 85 Mo. 190; *State v. Carlisle*, 57 Mo. 102; *State v. Hill*, 65 Mo. 84. (6) The objection to the evidence of the occurrence at the morgue, and as to the refusal of defendant to touch the body of the deceased was not accompanied by any ground or reason for the objection and is for that reason not available. *State v. Hope*, 100 Mo. 347.

GANTT, P. J.—The defendant was indicted, together with one John Willard for the murder, in the first degree, of Edward Drexler, in the city of St. Louis, on the twenty-fourth day of April, 1892, by beating and wounding him on the head with an iron bar; Willard was charged with being present, aiding and abetting the murder. Defendant was duly arraigned at the May term, 1892, and entered a plea of not guilty. A severance was granted. The cause was tried at the March term, 1893, and defendant convicted of murder in the first degree. The evidence was in substance as follows:

Deceased occupied the first floor and cellar of the building, 818 Pine street, in the city of St. Louis. In the front of the first door he had a cigar stand, upon one side, and a soda fountain on the other. A rectangular partition cut off the rear from the front. Along the east wall in the rear of the soda fountain was a row of raised chairs, for the purpose of blacking boots and shoes, parallel with which ran one side of the partition. The other side of the partition, parallel with the front of the building, was immediately in the rear of the cigar stand, and behind it was an apartment used for manufacturing cigars; still further to the rear was an apartment, partly enclosed by partition and partly enclosed by curtains, used by deceased as his sleeping room, containing a couch, stove and a few other articles of furniture. The hallway, in which stood the row

of chairs, was closed in the rear by curtains (or *portieres*) and in the eastern rear was an open space, in which was a trap door opening into the cellar, down into which led a plain stairway. A glass door in the rear wall (over which was a transom) led into a narrow, paved alley, used only by foot passengers, leading west to Ninth street. The only furniture in the rear space was a folding stepladder. In the sidewalk in front was a round coal hole, covered with a grating, held in place by a perpendicular rod screwed into a flat iron bar, braced against the under side of the pavement across the hole, and held in place by a nut. In the cellar under the pavement was a pile of coal, and further back under the building was a place for setting the soda retorts, connected by pipes with the fountain above.

Deceased lived alone in the place, having no family. He usually employed two or more negro boys to black shoes, who came on duty about 7 or 8 o'clock in the morning and left about 7 or 8 in the evening. At the time of the alleged homicide, he had two negro boys thus employed, one John Hill and the defendant, the latter of whom had been working there only a few days, but had thoroughly informed himself of the habits and hours of the deceased, and of all the details and arrangements of the premises, and had learned that deceased kept a large amount of money about the place.

On Sunday morning, April 24, 1892, the boy, Hill, came to the store at about five minutes to 8. Appellant was sitting on the steps of an adjacent building at the time. Hill tried to open the door, but found it fastened. He asked appellant what was the matter, and the latter answered that he guessed "the old man had committed suicide," or something like that. While he stood there, a milkman stopped at the place, who also

tried the door and shook it.   Then came Mr. Garvey, a friend of deceased, and a customer of the place, to get his shoes blacked.   The latter went around in the rear alleyway, looked through the glass door, but could not see anything, but shook and rattled the door, while the milkman at the same time shook and rattled the front door.   The milkman drove off and Mr. Garvey returned to the front door, where Hill and appellant still were.   Just at that time, Garvey, looking through the glass door in front, saw the deceased coming through the curtains at the end of the row of chairs, dragging himself slowly and painfully along the floor. Hill exclaimed, "There he is!"  Garvey told Hill to go at once for a police officer, while he himself ran across the street to a stable and obtained a bar with which he forced open the door.   The appellant disappeared at that time.   Garvey went in and found Drexler in his underclothes only, covered with blood, principally about the head and face, and unable to make any articulate utterance.

A police officer was soon on the ground, who took charge of Drexler, summoning an ambulance in which the wounded man was sent to the city hospital.   An examination of the premises was then made.   The sleeping room of deceased was found to be spattered all over with blood, as though a desperate struggle had taken place; a pool of blood alongside the cot; his pantaloons and the pockets turned wrong side out; there were bloody finger marks upon the stepladder in the rear, but the rear door was locked and the transom was fastened.   Near the trapdoor lay an iron bar, with blood and hair upon it, which was found to fit the iron rod of the coal hole grating.   No other bar was found, nor any other weapon.   Meantime some other officers came, and quite a crowd gathered, among whom was appellant.   He, with Hill, was taken to the police head-

quarters, where they were examined as to their where-abouts during the night. Hill's statements were ver-ified upon inquiry.

Appellant declared that he had spent the night at 1203 Morgan street, which was shown to be false, as he had not been to that house for three weeks. There were some flecks of blood upon his face, which he attrib-uted to a bleeding at the nose. Some spots were dis-covered upon his pants, which were taken off him and delivered to the city chemist, who declared the spots to be blood stains not more than twenty-four hours old.

Meanwhile the deceased died at the hospital, with-out recovering consciousness or being able to speak. The autopsy revealed several wounds upon the head, and a fracture of the skull extending from close to the nose on the right side, over backward and under the base of the brain to the opposite ear, about seventeen inches long; the blood vessels of the vein were rupt-ured in numerous places; many blood clots were found, as also small pieces of bone, and the wound on the scalp indicated that they had been made with a blunt instrument.

Appellant was held pending the coroner's inquest, at which he was present, and voluntarily made a state-ment, under oath, in which he stated that he had been to a number of places during the night, and slept in a saloon on Twelfth and Lucas avenue from 1 to 6 o'clock, after which he got his breakfast, and then went to Drexler's store to go to work. He declared that if any blood had been found on his clothes it had been put there by the officers, "who had a grudge against him." He admitted that he had been down in the cellar during Saturday afternoon on the occasion of a soda retort being lowered for the fountain, and had taken the iron bar from the descending rod, and had neglected to replace it. He also claimed he might

have gotten some blood on his clothes in Drexler's room that morning when the officers and crowd were there, as he had gone in there with the officers and picked up Drexler's bloody slippers.

After this statement had been made before the coroner, a statement was then made by the codefendant Willard, who had been taken into custody; and in the evening, after the inquest had adjourned, appellant sent word to the police department that he desired to tell all he knew. He was brought into the office of the chief of detectives, where he made a voluntary statement, which was reduced to writing in his presence, read to him and signed by him. In this he stated that he had informed Willard that Drexler had lots of money in his pocketbook, and as Willard was crazy to get some money, they had planned to rob Drexler's place on Saturday night; that they had gone together to the neighborhood about 9 o'clock that night, and waited until half past 10 for Drexler to leave, but as he did not close, the plan was abandoned; that he went to sleep in the saloon aforesaid and was waked by Willard, who said he was going down to Drexler's to get that money; that Willard returned about half past 4; that he met him outside the saloon, and they went together to Willard's room, where the latter told him he could not find the "leather" and had hit Drexler over the head with an iron bar; that Willard asked him to pull off his shoes, "as he was tired;" that he did so and found his socks all bloody, and in that way he must have gotten the blood upon his face, hands and pants. He also said that Willard had brought away with him the key to the store, and he saw him hide it in an alley about a block and a half from the store the next morning.

Appellant was before the coroner at the renewal of the inquest on the following morning, when he again

requested permission to make a sworn statement, and was allowed to do so. In this statement he claimed that his sworn statement of the previous day was false, and that he had so sworn falsely to screen his friend Willard. He reiterated that he and Willard had planned to steal Drexler's money. Said he: "Willard said he had to have money somehow,  *   *   *   and he did not know how to get it, and I told him, 'well, John, I know a good scheme. My boss has lots of money; he goes to the theatre every night. I'll tell you a good scheme that we will do. We will lay for him some night when he goes to the theatre; we will slip in the back way over the transom, and will ransack the place and he would not know who done it.' " The plan was arranged to steal the money on Saturday night, and on Friday Willard came to the store, ostensibly to buy cigars, but in realty to "size up" the place. It was arranged that Willard was to come to the store at exactly 7 o'clock in the evening; Wisdom would send Hill out to get some lunch, and while he was out Willard would be slipped into the cellar; on Hill's return he and Wisdom would eat the lunch, and then Hill would be sent out again for beer; while he was out Wisdom would also slip into the cellar, and Hill on returning would suppose he had gone home. Appellant alleged that the plan failed because Willard did not keep his engagement at 7 o'clock, but that they met later, returned to the vicinity and waited for Drexler to come out and close the store, but he did not say how they were to get into the store in Drexler's absence. As Drexler did not come out by 10 o'clock, they gave up the "scheme" until the next night.

He gave what he claimed was Willard's statement to him of the killing, viz.: "He said he went down into the coal hole and went on upstairs out of the cellar; he says he stood here for a long time after he got upstairs,

and he says he had been there about fifteen minutes when the man got up and struck a match; and he says before the match had got ignited real good he struck the man with the iron bar and knocked him on the floor; he says the man groaned awful and he hit him again; and he says he was so frightened that he did not have time to accomplish his purpose; what I mean is, to look for the money good."

Asked how Willard would know that the iron bar was in the cellar, he replied: "That is the first thing he could have seen when he was down in the hole; it was on a box right by the hole."

"*Q.* Did you tell Willard where it was? *A.* I did not tell him where it was.

"*Q.* How did he come to know? *A.* He could not help but see it.

"*Q.* How did he come to kill the man with the bar? *A.* He could not help see it.

"*Q.* Did you tell him anything about the bar? *A.* I said, 'John, when I was working to-day I took the bar off the coal hole to let some soda water down there, and I neglected putting it back on there again.'"

He claimed that from 1 o'clock to half past 4 in the morning he was sleeping in the saloon. The proprietor of the saloon testified that on that Saturday night Willard came into the place as early as 7 o'clock; that Wisdom came in between 10 and 11, and they were sitting around and talking together; they were in the room where the "crap" game was going on, but as they did not participate they were asked to retire into the saloon proper, where they remained until about 1 o'clock A. M., when they went out together; they returned together between 3 and 4 o'clock A. M.; went into the gambling room and commenced playing; both had money when they returned, and this was the first playing they had done that night.

Appellant stated to the officer (Scully) that he had seen Willard hide the front door key in an alley on the Sunday morning of the homicide, about 8 o'clock; he stated he could not tell on which side of the alley it was hidden, as he did not go into the alley himself; he said, "if you go down there and look you will find it, and that will be proof on Willard." Scully made a search for the key in the alley, but could not find it. He reported to the appellant that he could not find it, and appellant then gave more minute directions, on which the key *was* found in a tin can in a backyard. The officer told appellant that he had not found it, and asked him if he could lead him to the spot if he were taken out, and appellant said he could. He was then handcuffed to the officer, taken out of the prison and led the officer to the very spot, picking up the can which held the key and showing the key to the officer, which proved to fit the lock of Drexler's front door.

The appellant offered no testimony at all, but demurred to the state's evidence, which demurrer was overruled.

It is deemed unnecessary to encumber the record with the instructions as only one of them is challenged by the counsel for defendant, and the others are such as have been often approved by this court.

I. The proposition of counsel for defendant that because the state introduced in evidence the statements of the defendant before the coroner's jury, it thereby made him a witness for the state, and it could not introduce defendant's other statements to different persons tending to contradict his testimony before the coroner, is utterly untenable. It is always competent to put in evidence the admissions of the adverse party, but it was never held that such admissions were conclusive upon the party offering them. *State v. Hayes,* 78 Mo. 307; *State v. Carlisle,* 57 Mo. 102.

II. Defendant for the first time interposes an objection to the action of the criminal court in admitting his evidence before the coroner. He insists that notwithstanding he voluntarily testified before the coroner and requested of his own motion the privilege of making his statements on two different occasions, still they are not admissible on his trial under the indictment.

There are two reasons why this contention can not be sustained here. *First:* There was no objection to this evidence in the trial court. A careful examination shows no objection and no ground of objection to its competency. Pending the reading of the stenographer's notes of this statement, we find this minute. "Mr. Krone (of counsel for defendant) 'This goes in, of course, subject to our exception.'" But there had been no objection, no ruling by the court, no reason assigned for its exclusion and hence there is nothing here for review. R. S. 1889, sec. 2302.

*Second:* The point was ruled adversely to defendant's contention in *State v. Mullins*, 101 Mo. 514, and in *State v. Young, ante,* p. 495. In both of these cases it is held that the test of admissibility of the statement of a party accused of a crime, whether made in judicial proceedings or not, is whether they were voluntary. The distinction once made, that if they were under oath they were inadmissible, is no longer maintained. The circumstances under which they were obtained must determine the question in each case. If they were voluntary, they are admissible.

In *State v. Young* they were excluded because it was considered a clear departure from the principles of criminal jurisprudence and a violation of the spirit of our constitution to take one suspected of a crime before a coroner or magistrate, swear him *nolens volens,* subject him to a rigid examination without apprising him

of his right to refuse to testify and then admit the evidence so obtained against him on his trial for the offense, over his objections and against his protest.

But in this case no such state of facts was suggested. The defendant on each occasion requested the privilege of making his statements. The statements themselves bear evidence of being voluntary by their rambling character, and by confusing the material and immaterial together. It is true that now and then a juror asked him a question in connection with some statement he had made but the preliminary evidence of the stenographer and other witnesses all go to show it was not only voluntary, but defendant sought the privilege in order to cast the crime upon Willard. For these reasons it must be held that no error was committed in receiving the prisoner's evidence before the coroner.

III. The instruction of which defendant complains is as follows:

"If you believe and find from the evidence that defendant made any statement or statements in relation to the homicide charged by the indictment, after said homicide is alleged to have been committed, you must consider such statement or statements all together. The defendant is entitled to what he said for himself, if true, and the state is entitled to the benefit of anything he may have said against himself in any statement or statements proved by the state.

"What the defendant said against himself the law presumes to be true, unless negatived by some other evidence in the cause, because said against himself. What the defendant said for himself, the jury are not bound to believe, because it was said in a statement or statements proved by the state, but the jury may believe or disbelieve it as it is shown to be true or false by the evidence in this cause; it is for the jury to consider

under all the circumstances, how much of the whole statement or statements of the defendant proved by the state, the jury, from the evidence in this case, deem worthy of belief."

This instruction has been so often approved, it is unnecessary to discuss it. *State v. Hopper*, 71 Mo. 425; *State v. West*, 69 Mo. 401; *State v. Carlisle*, 57 Mo. 102.

IV. In the course of the examination of the witness Hill, he was asked to tell what happened down at the morgue by the dead body of Mr. Drexler, when the witness Willard and defendant were there, prior to the inquest. This was objected to as immaterial; the objection was overruled. The witness answered that "they told us to put our hands on Mr. Drexler," and that he "and Willard did so, but defendant wouldn't do it." Officer McGrath corroborated this statement. Defendant objected to McGrath's statement, but assign-ed no reason. The action of the court in this regard is now assigned as error. Who it was that told them to put their hands on Mr. Drexler's dead body does not appear.

The request to touch the body was evidently prompted by the old superstition of the ordeal of the bier in Europe in the Middle Ages, which taught that the body of a murdered man would bleed freshly when touched by his murderer, and hence it was resorted to as a means of ascertaining the guilt or innocence of a person suspected of a murder.

This superstition has not been confined to one nation or people. It obtained among the Germans, prior to the twelfth century, and is recorded in the *Nibelungenlied*, the great epic poem of that country, in the incident in which the murdered Seigfried is laid on his bier and Hagen is called on to prove his innocence by going to the corpse, but at his approach the dead

chief's wounds bleed afresh. That it dominated the English mind is attested by the passage of Matthew Paris, that when Henry II. died at Chinon in 1189, his son and successor came to view his body, and as he drew near, immediately the blood flowed from the nostrils of the dead king as if his spirit was so indignant at the approach of the one who caused his death, that his blood thus protested to God. And Shakespeare voices the same superstition in Richard III., in act 1, scene 2, thus:

"O! gentlemen, see, see! dear Henry's wounds
Open their congealed mouths and bleed afresh."

And so does Dr. Warren, in "Diary of a Late Physician," 3 vol., p. 327. That it was a prevalent belief in Africa and Australia, in another form, see 17 Encyclopedia Britannica, pp. 818, 819.

This superstition has come to this country with the emigration from other lands, and, although a creature of the imagination, it does to a considerable degree affect the opinions of a large class of our people.

It is true it was not shown that defendant believed that touching this body would cause any evidence of guilt to appear, or that he entertained any fear of possible consequences, but it was simply a test proposed by some bystander, and it was offered as showing the manner in which the three suspects conducted themselves when it was proposed. *Clarke v. State*, 78 Ala. 474; Chamberlayne's Best on Ev., page 488.

While defendant had a perfect right to decline, either because of his instinctive repugnance to the unpleasant task or because no one had a right to subject him to the test, and his refusal might not prejudice him in the minds of a rational jury, on the other hand, a consciousness of guilt might have influenced him to

refuse to undergo the proposed test, however unreasonable it was and it is one of the circumstances of the case, that the jury could weigh. The jury could consider that, while it was a superstitious test, still defendant might have been more or less affected by it, as many intelligent people are by equally baseless notions as shown by their conduct and movements. It often happens that a case must be established by a number of facts, any one of which, by itself, would be of little weight, but all of which taken together would prove the issue. There is not the slightest evidence that any member of the jury itself regarded the test itself anything more than a groundless superstition. Moreover no ground for its exclusion was suggested save immateriality, and the fact that a piece of immaterial but harmless evidence creeps into a case is not enough to reverse it. It must be an error materially prejudicial.

We have gone carefully through every line of the record. That Edward Drexler was murdered on the twenty-fourth of April, 1892, does not admit of a doubt. That his murderer deliberately and premeditatedly conceived the plan of entering his sleeping apartment by removing the iron bar which held the grate over the coal hole in place, and effected his entrance in that way, is beyond all question. That the murderer killed Drexler with this iron bar, the blood and hair of the victim upon it fully attested. That defendant was the guilty agent, the jury have found, and there was ample evidence to sustain their verdict, in his knowledge of the premises; his statements and contradictory stories; his hiding of the key to the door; his possession of money with which he gambled on that night after the homicide; the falsity of his stories in regard to his *alibi;* his familiarity with all the details of the killing, which he ascribed to his

accomplice; the blood upon his face and clothing; his knowledge and confessed purpose of securing the money he knew his employer kept in his store, and his failure to inform Hill and Garvey of his knowledge of the murderous assault.

The cause was well tried, and his counsel have urged every plea in his behalf which the law recognizes, and the judgment and sentence of the lower court must be, and are, affirmed. All of this division concur.