239 P.2d 711

**STATE v. JENKINS.**
No. 5393.

Supreme Court of New Mexico.
Jan. 8, 1952.

Adolf J. Krehbiel, Howard B. McClellan, Clayton, for appellant.

Joe. L. Martinez, Atty. Gen., Hilario Rubio, Asst. Atty. Gen., for appellee.

SADLER, Justice.

The defendant, a young man twenty-six years of age, was convicted of armed robbery and sentenced to a term in the penitentiary. The jury having recommended clemency the trial judge honored the recommendation by imposing the very light sentence of from three to five years imprisonment. This appeal is prosecuted to review the judgment of the trial court. The defendant prays that he be granted a new trial.

The facts are few and simple. J. H. Rankin, a well known business man who has resided in Clayton for many years, returned to his home only three or four blocks from the Silver Moon Cafe in downtown Clayton at about 9:00 o'clock p. m. on Saturday night, April 22, 1950. When he went to his bedroom, shortly after entering the house, he was confronted by a masked robber with a .45 calibre revolver pointed at him and ordered to turn over his money. The victim obligingly complied and was relieved at the same time of a diamond stick pin valued at several thousand dollars as well as a .25 automatic pistol. Thereupon the robber made his departure, jerking a telephone off the wall before doing so, after warning his victim to lie down on the bed in the bedroom and not try to make any trouble.

As soon as Mr. Rankin felt safe in doing so he called out to the intruder an inquiry whether he might come into the living room. Getting no reply, he arose from the bed and finding the robber had fled proceeded up town where he reported the robbery to the police. He was unable to identify the robber to the police, although he did give them a rather accurate description of his size and described how he was dressed. The mask he wore appeared to have been made of rubber, the hat was pulled down over his head, he wore gloves and tan shoes and his clothes were of khaki material. The victim could not say whether he was a white or colored man but stated his speech indicated an effort to disguise his voice.

From early that afternoon until almost midforenoon of the following day a poker game was in progress in a room above Silver Moon Cafe, participated in at various times by several well known residents of the town. At different times as many as six or seven were participating in the game at one time. The defendant was one of the participants in the afternoon, entering it again after the supper hour between 7:00 and 7:30 o'clock in the evening. His luck was good in the early part of the game in the evening but by 8:30 o'clock he had lost all his winnings as well as his initial stake. He thereupon left the game, went downstairs, out on the street and during an absence of approximately 20 minutes, proceeded to the home of Rankin nearby where he committed the robbery detailed above.

Following the robbery, the defendant returned to the game and continued to play for about an hour when he left that game and visited the Jim McDonald house where another game was in progress. One Pete Parras was in charge there and the defendant impressed him as being drunk, though he finally sat down and played a few hands, swearing at Parras occasionally. The defendant suddenly asked Parras to visit the toilet with him. When inside, he took the diamond stick pin from his mouth and held it in the palm of his hand. Upon being asked where he got it, he stated he took it from "Slats," a nickname by which Mr. Rankin is generally known in the community. Parras then inquired what he proposed doing with it and he replied he would get something for it. To this, Parras replied, "all you can get is fifteen cents and trouble." Whereupon defendant put the pin back in his mouth and resumed his place at the card table for about ten to fifteen minutes, then departed.

In the meantime, but prior to defendant's confessions and subsequent arrest, suspicion having pointed toward another local resident as the one actually perpetrating the robbery, a criminal complaint charging him accordingly was filed with the local justice of the peace. This prosecution was later abandoned. So matters stood following the

robbery, although the defendant had been detained as a suspect for a few hours and questioned shortly after it was reported. However, at the time evidence that defendant committed the robbery was not deemed sufficient and the District Attorney ordered his release.

Thereafter, on June 30, 1950, officers at Guymon, Oklahoma, placed the defendant under arrest on a charge of cattle stealing. His identity was established from the license number on his car through a telephone call to State Patrolman Earl Morris, at Clayton. The latter proceeded to Guymon as soon as identity of the suspect was established. The defendant was questioned in the office of the County Attorney at Guymon where he made a written confession to the Oklahoma charge of stealing cattle.

When his statement had been typed by the stenographer in the office of the County Attorney, the latter asked defendant if there was anything else he wished to get off his mind. The defendant looked around until his eyes fell on officer Morris, motioned him over toward him and in a low tone of voice said to him that he wished to give a confession on the Rankin "deal" and get everything off his conscience at one time. Morris explained they would have to have a witness. Accordingly, they went into the office of the highway department located in the county courthouse. There in the presence of officer Morris, officer Tommy Howard, Investigator for the Oklahoma Bureau of Criminal Investigation, and Christine Fankhouser, the County Attorney's secretary who took the statement and transcribed it, the defendant related the details of the Rankin robbery. In his recital he accepted full responsibility for the crime, stating that he alone was implicated.

In the meantime and based on information secured from the defendant in the written statement just mentioned, J. F. Wilkes of Clayton was arrested, charged with receiving stolen property. Furthermore, after giving his written statement at Guymon, Oklahoma, where the defendant was still held, he had indicated to the officers a desire to enlarge upon that statement, giving certain details of the robbery theretofore omitted which he said properly belonged in it. Accordingly, he was taken by officers Morris and Tommy Howard to the office of District Attorney John B. Wright in Raton. There, on July 7, 1950, in the presence of the District Attorney, officers Morris and Howard, and Florine Glen, stenographer in the office of the District Attorney, who took down and transcribed the same, the defendant made and signed the second written statement, filling in many of the details omitted from his former statement. After signing same, it was witnessed by Earl K. Morris and Tommy Howard, the officers mentioned hereinabove.

It should be added that prior to dictating the statement last mentioned, the mask worn by defendant in the holdup which had been recovered through information furnished by him, and also the gun used in the robbery which had come into the hands of the officers were exhibited to defendant in the office of the District Attorney and identified by the former as the gun and mask used in the robbery. Indeed, the defendant went into detail in explaining to the officers certain changes he had made in the mask for use on this occasion and asked if the gun could be returned to him for placing in his home, apparently for protection of his family, while he was away. The officers explained to him it would have to be retained until his trial for use as evidence.

Thereafter and on July 17, 1950, J. F. Wilkes, charged with receiving stolen property had his preliminary examination before a justice of the peace in Clayton. The defendant appeared voluntarily as a witness at this trial, was sworn and testified for the state. He claimed no privilege, admitted his part in the robbery, also disposition of the diamond pin to Wilkes, and other incidents connected with both the robbery and disposal of the property to Wilkes. Shorthand notes of the testimony were taken and later transcribed, and in so far as the testimony related to the robbery itself, as distinguished from the charge against Wilkes, it was introduced in evidence at defendant's trial.

Within a few days following the preliminary examination of Wilkes the defendant sent word to Rankin that he wished to see him. This message was brought to Rankin by officer Morris whom he asked to accompany him to defendant's home where he resided with his wife and child. Upon entering the house, the defendant led Rankin and Morris into a bedroom adjoining the living room. Morris remained with the other two but a few moments when he retired. The defendant then made the following statement to Rankin: "Q. Read the question (done). A. He says Slats I am sorry I robbed you. I don't know why I did it unless I was broke and needed money. First, he says I hardly know how to say what I want to talk to you about. I says, I imagine I know. That is when he told me he said he was sorry he robbed me. I says that is too bad, cannot be helped. Your Dad and I used to be in business together; always good friends. When you get out of this mess behave yourself and try to go straight. That is what I told him."

A mere reading of the foregoing recital of facts, all well within the jury's verdict of guilty as findings of fact, convincingly establishes the lack of merit in defendant's motion for a directed verdict in his favor interposed both when the state rested and when both sides had rested at the conclusion of the trial. The motion was based primarily on the contention that the

uncontradicted evidence established the defense of alibi. However, even if the deadly admissions of guilt in his several confessions be ignored, the several witnesses participating in the poker game were practically unanimous in giving defendant enough time in the intermission covering his absence from the game to enable hm to reach the scene of the crime, commit it and return to resume his place at the poker table. The conclusion announced disposes of the claim of error urged under defendant's first assignment of error. Since all others relate to error said to arise on the admission in evidence of various writings and testimony amounting to confessions admitted in evidence over defendant's continuing objection that their voluntary character had not been adequately shown to entitle them to probative force, they will be taken up and disposed of together.

It may be well at the outset to enumerate the various documents and testimony complained of by defendant under this branch of his case. They will be listed.

(1) The written statement dated June 30, 1950, given before officers Morris and Howard at Guymon, Oklahoma, and witnessed by them.

(2) The written statement dated July 7, 1950, given in the office of District Attorney John B. Wright in Raton, likewise witnessed by officers Morris and Howard.

(3) Certain questions and answers of defendant transcribed by the reporter from notes taken at the preliminary examination of F. J. Wilkes held before a justice of the peace at Clayton, New Mexico, on July 17, 1950, on the charge of receiving stolen property.

(4) Oral testimony by J. H. Rankin reciting details of defendant's apology for the robbery made to him at defendant's home a day or two following the preliminary examination of Wilkes.

The foregoing items of evidence fall under a blanket objection leveled at each and all upon the ground that no proper foundation had been laid in that the voluntary character of the statement or testimony tendered had not been shown; that such being the case all subsequent statements or admissions must be presumed to have been made under the same influence that produced the first. Accordingly, it will be best to take up and deal with these items of evidence separately, the first being State's Exhibit No. 1, the written statement made at Guymon, Oklahoma, on June 30, 1950.

It would unduly lengthen this opinion to endeavor to set out in question and answer form the details leading up to execution of this statement by defendant. Suffice it to say that he was asked for the truth and the state's testimony, worthy of belief by the jury, disclosed there were no

threats or promises employed nor was there any evidence of force; that throughout the defendant seemed in a thoroughly repentant mood, his eyes often filling with tears and he obviously was greatly relieved when he had told his story and gotten it over with. Counsel for defense had objected to so much of the statement at· its beginning as was dictated by officer Morris, advising defendant of his constitutional rights, so the court excluded that portion; also all parts that had reference to disposition of the diamond pin to Wilkes, involving commission of a separate offense, were excluded on objection of defense counsel. All of the matter pointed out by defense counsel as objectionable upon grounds other than his general objection that a proper foundation had not been laid was excluded. The writing was then read to the jury, omitting the deleted parts.

Coming next to the written statement signed by defendant on July 7, 1950, at the office of the District Attorney in Raton. Here, as in case of the statement given at Guymon, Oklahoma, credible testimony of all present at the giving of the statement, except the defendant, disclosed its free and voluntary character, the defendant himself stating over his signature that it was so. All present save the defendant said there were no promises, threats, nor force of any character. Indeed, as already noted, the giving of the second statement was largely at the instance of defendant himself, because as stated by him there were several details which should have gone in the first statement that were omitted. The Court, itself, while the District Attorney was testifying, called as an adverse witness by the defense, put questions to him and received the answers indicated, to-wit:

"The Court: In your presence in Raton, at the time Exhibit 4 was signed by the defendant, Mr. Jenkins, did you or anyone in your presence make any promise of immunity, or any promise of any kind to the defendant Jenkins in return for his signing this statement?

"Mr. Wright: I didn't, and no person did in my presence.

"The Court: As I understandt it then, after this statement was signed, you did in effect promise the defendant in this that if he would enter a plea of Guilty to the charge filed in this court against him that you would recommend the minimum sentence under the statute?

"Mr. Wright: I did not.

"The Court: Just what did you tell him?

"Mr. Wright: I told him that if he would enter a plea of guilty to the charges I would then recommend a minimum sentence to the court.

"The Court: Was that statement made by you in any way directed as an inducement for his signing Exhibit 4?

"Mr. Wright: It was not; and I don't mind telling the Court that after I got that statement signed I felt I had two in the sack instead of one.

"The Court: Mr. Wright, does the court always follow your recommendation?

"Mr. Wright: I am sorry to say, it does not."

■ Here as in the case of the earlier statement, State's Exhibit No. 1, certain portions of the writing, especially portions relating to disposition of the diamond pin to Wilkes, were excluded. The statement as deleted was then read to the jury. We see no error and think the trial court properly submitted the statements for final appraisal by the jury. State v. Anderson, 24 N.M. 360, 174 P. 215; State v. Lord, 42 N. M. 638, 84 P.2d 80, the able and vigorous argument of counsel for defendant to the contrary, notwithstanding. The jury found the statements were voluntary and we cannot properly overturn that finding on the record before us.

But it is said the action of the District Attorney at the time of the Raton meeting, out of which came the second and supplementary confession of guilt, in offering to recommend to the court a minimum sentence, if the defendant should elect to follow his confessions by a plea of guilty, upon arraignment, absolutely concludes the state and leaves nothing remaining but to declare this offer attaches the taint of involuntariness, even if retrospectively, to every admission of guilt previously made by the defendant. Indeed, counsel rely upon two offers by the District Attorney to recommend the minimum sentence of three years to some indeterminate date, upon a plea of guilty by defendant, one made to defendant personally after he had given his statement in writing at the Raton meeting, and the other in a message to counsel for defendant through the court reporter in complying with a request on him by such counsel for a copy of the transcribed notes of the reporter on the Wilkes preliminary hearing.

Both offers were in substance the same, namely, to recommend a minimum indeterminate sentence, if the defendant should plead guilty and save the state the expense of a trial. The District Attorney explained it was his practice to make a similar recommendation under like circumstances to those here present, though he informed defendants, as in this case, that the court did not always follow his recommendation.

It is not a matter of argument that if the statement secured at Raton, or any secured elsewhere, was induced by this offer on the part of the District Attorney to

make a recommendation for the lightest sentence open to the court, then any such statement is involuntary and should have been so declared by the trial court. But how could the offer have induced the statements, or any of them, if it followed all of them? The inquiry furnishes its own answer. Here is the evidence on the subject. In answer to a question by defense counsel, the District Attorney replied as indicated· below:

"Q. Now, you did or did not indicate to Mr. Jenkins that you would try to get a light sentence for him? A. I indicated to Mr. Jenkins, *after he made the statement in my office,* that I would make a recommendation to the court in his behalf, if he would make a plea of guilty.

"Q. He hadn't made a statement to the officers prior to that had he? A. Yes,—I want to explain that a little bit. I feel that if I can save the State of New Mexico any prosecution such as this I will do it, and I will always make a favorable recommendation when a man pleads guilty whereas I might not make that recommendation if he forces the State of New Mexico to go to trial, and I think that is only a human reaction." (Emphasis ours).

The court itself interposed a question touching this very matter before the wit-· ness left the stand and it was answered, as shown below:

"The Court: In your presence in Raton, at the time Exhibit 4 was signed by the defendant, Mr. Jenkins, did you or anyone in your presence make any promise of immunity or any promise of any kind to the defendant Jenkins in return for his signing this statement?

"Mr. Wright: I didn't, and no person did in my presence."

The defendant throughout has argued his case from a false premise, namely, that the statement confessing his guilt given at Guymon, Oklahoma, was involuntary because induced by promises of leniency. We realize he testified such promises were made and his counsel, accepting that testimony as true, argue his case on that hypothesis. But all others present at the time dispute his testimony on this vital question. The trial judge and the jury were privileged to believe them and not the defendant.

█ It is also made a part of defendant's argument that at the time he made this as well as the other statement at Raton, he was under arrest and had not had the benefit of counsel. Indeed, these factors were incorporated into the objection made by his counsel at the time the statements were offered in evidence. These facts were admitted but they do not render· the state-' ment involuntary as a matter of law. State v. Dena, infra. See, also, United States **v.**

Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. ——, and Gallegos v. Nebraska, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. ——, both recently decided.

So much for the two written confessions placed in evidence, with deletions made as directed by the court. The two remaining items of evidence are the verbal apology tendered Rankin at a meeting requested by defendant and pertinent excerpts from his oral testimony given at the preliminary hearing of Wilkes. Here, as in the case of objections to the two written statements, State's Exhibits Nos. 1 and 4, the chief, indeed, the only objection was that the defendant was moving under the compulsion of promises made him by officers Morris and Howard and the District Attorney and not acting of his own free will and accord. Such a contention as to the meeting requested by defendant himself in which he apologized to Rankin for having robbed him is so lacking in merit as not to deserve serious consideration.

■ The defendant himself had sent for Rankin in order to make this apology. He was at his own home, under no restraint, having been released on bond and apparently was acting of his own volition and in a genuinely repentant mood initiated the meeting at which he apologized and made the admission of guilt. Nevertheless, although the facts mentioned would seem to leave no doubt about the matter, whether this admission of guilt was voluntary was within the court's instructions and the verdict of guilty constitutes a finding that it, too, was voluntary, a finding so obviously correct as not to expose itself to challenge.

We now take up defendant's complaint that the trial court erred in admitting in evidence certain questions put to defendant as a witness at the preliminary hearing of F. J. Wilkes on the charge of receiving stolen property held at Clayton on July 17, 1950, and the defendant's answers to such questions. The selected portions of defendant's testimony at the preliminary, in so far as they constituted admissions by him that he committed the robbery, were read to the jury after having been read to the court out of the presence of the jury.

Prior to being introduced in evidence, the defendant interposed at length his objections to the admission of the questions and answers. In substance, so far as material, they were that defendant had not been advised of his constitutional rights in the other case (the robbery charge pending against him); that it appeared he had come into court in the custody of an officer; that he did not have counsel and was not asked whether he needed or desired counsel; that he was not in any way advised of any of his constitutional rights. Finally, it was objected that there was no showing of

what promises, threats or inducements were made to defendant prior to his appearance at this preliminary hearing in the custody of an officer and that, therefore, it neither affirmatively appeared nor had the state proved that this evidence was voluntary in the legal sense.

Thereupon the following colloquy between the Court, counsel and the witness on the stand, the preliminary magistrate, took place, to-wit:

"The Court: As I understand, the State is offering only that portion of the testimony given by the defendant as a witness as has been read into the record from the transcript of that testimony.

"Mr. Wright: That is correct.

"The Court: Judge Stead, I take it over a period of years you have observed many witnesses testify in your court?

"The Witness: Yes, sir.

"The Court: And when this defendant testified in your court on this day, did he appear to be testifying voluntarily and of his own free will, to you?

"The Witness: He was very willing,—very cooperative.

"Mr. Krehbiel: May I ask one question?

"The Court: Yes.

"Mr. Krehbiel: If a witness coming into your court to testify had been promised leniency, clemency, or a very light sentence, and that he would profit thereby, and actually believed that, do you not believe he would be a willing witness and testify as a result of such promises?

"The Witness: Well, the fact isn't established that these promises—

"Mr. Krehbiel: I am asking this question.

"The Witness: If he was promised that, no doubt he would be."

After further but immaterial colloquy between the Court and counsel, the objections interposed were overruled and the questions and answers were read to the jury, counsel for defendant being granted the privilege of objecting to individual questions and answers dealing with collateral matters and also of having it understood that as to each question and answer not objectionable on that ground an objection would be deemed made, couched in his own words, as follows:

"Mr. Krehbiel: Did I make the offer of objection—it would be a culmination of various objections,—that there was no proper foundation laid?

"The Court: Oh, yes."

Thus it is and as finally appraised by defendant's counsel himself, the major objection interposed to the transcript of questions and answers introduced from the prelimi-

nary examination of Wilkes boiled down to one of voluntariness and will be so treated by us.

As already pointed out in earlier portions of this opinion, the defendant had been warned of his constitutional rights both before signing the confession taken at Guymon, Oklahoma, on June 30th and the one made at Raton, New Mexico, on July 7th. He had been informed by officer Morris that any statement made could be used against him. He apparently was in a somewhat emotional state at time of the Guymon confession and desirous of getting the whole thing off his conscience. The trial court, as indicated above questioned the committing magistrate as to whether there was anything in defendant's demeanor on the stand to suggest he was testifying under coercion or intimidation, no doubt moved to this interrogation by the fact that defendant was not under subpoena to testify for the state and was still in custody on the robbery charge. Furthermore, in ruling upon the question of whether defendant's admissions at the preliminary hearing of Wilkes were voluntary, the trial judge could give some weight to the fact that a few days later, when the restraint of custody was removed and defendant was free on bond, he invited the victim of the robbery, Rankin, to his home and there tendered him an apology for having robbed him.

We see no error in the trial court's ruling submitting to the jury defendant's testimony at the preliminary examination of Wilkes unless upon the objection interposed by his counsel, it was inadmissible as a matter of law. We do not think it was. Indeed, the admissions made before the committing magistrate at the Wilkes preliminary are not classed as extra judicial confessions. They are known as judicial confessions. They fall within a different class and are governed by a different rule. State v. Dena, 28 N.M. 479, 214 P. 583. Cf. State v. Wright, 38 N.M. 427, 34 P.2d 870.

Counsel for defendant cite cases such as Jackson v. State, 56 Miss. 311, 312; Tuttle v. People, 33 Colo. 243, 79 P. 1035, 70 L.R.A. 30 and Maki v. State, 18 Wyo. 481, 112 P. 334, 33 L.R.A.,N.S., 465, which they contend deny admissibility of defendant's testimony at the Wilkes preliminary. The court in Jackson v. State based its decision on the early case of People v. McMahon, 15 N.Y. 384, which applied the so called Selden theory of excluding such testimony because of the supposed mental agitation on the part of an accused rendering the testimony unreliable. The Selden views in this particular were later abandoned even in New York in Teachout v. People, 41 N.Y. 7. See, also, 3 Wigmore on Evidence (3rd Ed.) 283–325, §§ 842–852, especially the discussion on page 325; also, Dickerson v. State, 48 Wis. 288, 4 N.W. 321.

We think the court did not err in admitting certain parts of defendant's testimony given at the Wilkes preliminary. State v. Jones, 171 Mo. 401, 71 S.W. 680; State v. Long, 324 Mo. 205, 22 S.W.2d 809; Fairfield v. State, 155 Ga. 660, 118 S.E. 395; People v. Nachowicz, 340 Ill. 480, 172 N.E. 812; Powers v. United States, 223 U. S. 303, 32 S.Ct. 281, 56 L.Ed. 448, and extensive annotation of the subject generally in 5 A.L.R.2d 1404, 1444, 1459.

We approve a statement of what seems to us the proper rule in cases of this kind made by the Supreme Court of Missouri in State v. Long, supra [324 Mo. 205, 22 S.W.2d 813.], reading as follows: "The general rule in regard to the admissibility of evidence of this character is that statements voluntarily made by a defendant on a preliminary examination, *or on a former trial of himself or another person, may be received against the defendant as his admissions.* 16 C.J., p. 630, §§ 1251 and 1253, and notes numbered 41, 43, and 51. The test as to admissibility of such testimony is its voluntary character. This established, it is a matter of minor importance so far as its competency is concerned as to the tribunal before which the admission was made." (Emphasis ours).

In thus viewing the matter the Supreme Court of Missouri was adhering to an earlier pronouncement in State v. Wisdom, 119 Mo. 539, 24 S.W. 1047, 1050, where, after referring to two earlier decisions, the court stated: "In both of these cases it is held that the test of admissibility of the statements of a party accused of a crime, whether made in judicial proceedings or not, is whether they were voluntary. The distinction once made that, if they were under oath, they were inadmissible, is no longer maintained. *The circumstances under which they were obtained must determine the question in each case. If they were voluntary, they are admissible.*" Emphasis ours).

Finally, it is said the trial court erred in compelling the defendant to read into evidence on cross-examination the portion of the written confession signed by him at Guymon, Oklahoma, containing the warning dictated by officer Morris, after having excluded same from evidence as a part of the confession when it was originally offered in evidence. There are two answers to this claim of error, urged under defendant's assignment No. 3.

In the first place, the court improperly excluded the warning from evidence in the first instance. It constituted the introductory part of the confession informing defendant of his constitutional rights and stating that he was making the statement freely and voluntarily. There was no dispute but that it was dictated as a prelude to the

confession by officer Morris and that defendant composed the remainder of the confession which he himself dictated, thereby adopting as his own the language of the warning given by officer Morris. He could repudiate or explain it, if he wished, but he could not properly exclude from the jury what on its face he had made his own.

 In the second place, even if properly excluded from evidence in the first instance, it was a fact about which there was no dispute that the initial paragraph containing the warning was dictated by officer Morris. No one questioned that he did so. The only issue touching it was whether the defendant knowingly and voluntarily subscribed a statement containing the warning. That issue was but an incident to the larger and more bitterly contested one throughout whether any of these various admissions and confessions were voluntary. The error, then, if any, in having defendant read this portion of what he admittedly subscribed, was harmless.

It follows from what has been said that the defendant was duly convicted after a fair trial. Accordingly, the judgment against him should be affirmed.

It is so ordered.

LUJAN, C. J., and McGHEE, COMPTON and COORS, JJ., concur.