LEWIS MERCER, *Plaintiff in Error*, v. THE STATE OF FLORIDA, Defendant in Error.

Opinion Filed May 5, 1922.

Petition for Rehearing Denied May 29, 1922.

1. Where a transcript of the record. is prepared in a criminal case under Special Rule 3 the transcript need only show the judgment and such papers and proceedings in the cause that have been directed to be included by the written demands of the parties. And if the bill of exceptions purports to contain all the evidence the judge is required to certify that it contains all the evidence introduced at the trial.

2. In preparing a transcript of the record for the Supreme Court the old and the new rules should not be blended, but the transcript should be made up under either one or the other.

3. An indictment charging that the defendant did, on a day certain in a county named of the State of Florida, have sexual intercourse with a certain person named, and that such person was then and there the own daughter of the defendant and he was then and there the own father of the person named, sufficiently charges the offense of incest under the statute.

4. It is within the discretion of the trial court to allow a plea of not guilty to be withdrawn in order to plead in abatement, and unless an abuse of such discretion is shown the court's order will not be disturbed.

5. Where an assignment of error attacks two or more rulings of the court, it will fail if one of the rulings is correct.

6. An objection to the introduction of evidence upon the ground that it is immaterial, is too vague to be considered, and the court's ruling admitting the evidence will not be disturbed if the evidence is admissible for any purpose.

7. Where objectionable evidence is admitted over a valid objection but is afterwards admitted without objection, the first objection will be considered waived.

8. An assignment that the court erred in "permitting the State Attorney to examine a witness in an improper manner over objections of defendant, to-wit, the cross-examination" of a certain witness is too general to be considered.

9. Assignments of error predicated upon alleged facts and rulings that are not disclosed by the record cannot be considered.

10. Conviction of a person charged with incest may be supported upon the uncorroborated testimony of the person with whom the offense was committed.

A Writ of Error to the Circuit Court for Hardee County; George W. Whitehurst, Judge.

Judgment affirmed.

*H. D. Garrison,* for Plaintiff in Error;

*Rivers H. Buford,* Attorney General, and *J. B. Gaines* Assistant, for the State.

ELLIS, J.—The plaintiff in error Lewis Mercer, was indicted for the crime of incest alleged to have been committed upon his daughter during the month of April, A. D. 1921. The testimony of the daughter with whom the illicit intercourse was alleged to have been committed was to the affect that the defendant began such conduct about two weeks after the death of his wife, and by cruelty and intimidation subjected her body to his unlawful desires many times through a period of about a year, or longer. There was a verdict of guilt by the jury and judgment and

sentence pronounced by the court, which the defendant in the court below seeks to reverse here upon writ of error.

According to the certificate of the clerk which is attached to the record, the cause is brought to this court under special Rule 3 for the "making up of transcripts by the clerk in civil causes." The special rule was adopted in 1905 and provision was made by Special Rule 6 that Special Rules 1, 2 and 3 may be used in the preparation of transcripts of records and bills of exceptions in criminal and *habeas corpus* cases. These new rules require that a certificate by the clerk of the court shall be attached to the transcript that it contains a correct "transcript of the record of the judgment" in the case, and a true and correct recital and copy of "all such papers and proceedings in said cause as appears upon the records and files of my (his) office, that have been directed to be included in said transcript by the written demands of the said parties." The certificate of the clerk required by the old rule contained a statement that the pages to which the certificate was attached constituted "a true copy of all of the proceedings, and a correct transcript of the record of the judgment in the case" as appeared upon the files and records of the office.

This court has held that a transcript of the record prepared under the old rule in a criminal case in which the defendant was charged with a felony, must show that the defendant was arraigned and pleaded to the indictment and was personally present at every stage of his trial or the judgment would be reversed. See Warrace v. State, 27 Fla. 362, 8 South. Rep. 748; Lovett v. State, 29 Fla. 356, 11 South Rep. 172; Blocker v. State, 60 Fla. 4, 53 South. Rep. 715.

But in such cases if the transcript is prepared under the new rule it need show only the judgment "and such papers and proceedings in said cause" "that have been directed to be included in said transcript by the written demands of the said parties." The new rules also require that if the bill of exceptions contains all the evidence, there shall be inserted just above the signature of the judge the following certificate: I do hereby certify that the foregoing bill of exceptions contains all the evidence introduced at the trial in the above stated cause." The bill of exceptions in this case contains no such certificate, but at the bottom of page 27 the following statement is inserted: "The above and foregoing pages 1 to 27, is all the testimony of all the witnesses, submitted at the trial of this cause." The judge's signature appears at the bottom of page thirty of the bill. The statement in the bill of exceptions that "pages 1 to 27 is all the testimony of all the witnesses submitted at the trial of this cause," is not an improvement upon the certificate required by the rule. The reason however for ignoring the form of certificate prescribed by the rule may have been that the person who prepared the bill of exceptions desired to distinguish between the "testimony of all the witnesses" and "all the evidence introduced at the trial," a distinction which is perfectly good, the former being much narrower in its scope than the latter.

If the transcript of the record had been made up under the old rule, this judgment would have to be reversed because the record proper as distinguished from the bill of exceptions does not show that the defendant was arraigned and pleaded to the indictment. The transcript in this case however, appears from the form of the clerk's certificate to have been made up under the new rules, which were also ignored in some particulars. The new rules re-

quire that where the plaintiff in error presents a bill of exceptions to the judge to be made up and settled for the appellate court, he shall present with such bill an assignment of errors specifically mentioning each point that he intends to present in and by such bill of exceptions as grounds for reversal, and such assignment of errors shall be the guide for making up the bill of exceptions and shall be made a part thereof.    Special Rule 1.

The bill of exceptions contains no reference to an assignment of errors, and seems to have been made up according to the form prescribed by the old rules with some modifications of requirements prescribed by the new.

In the case of Albritton v. State, 54 Fla. 6, 44 South. Rep. 745, this court speaking through Mr. Justice WHITFIELD said as appears by the first headnote, that the two methods prescribed by the old and new rules for making up and authenticating bills of exceptions and transcripts of records should not be confused or blended.    And Mr. Chief Justice SHACKLEFORD speaking for the Court in the case of Clinton v. State, 53 Fla. 98, 43 South. Rep. 312, said the same thing.    In each case the transcript of the record was so made up that the observation seemed appropriate.    In both cases however, the point was considered; in one case the judgment of the lower court was reversed, and in the other it was affirmed.

The bit of advice given in the two cases seems to have been overlooked in the preparation of the transcript in this case, but as it may be done with impunity seemingly we will consider the questions which are actually presented.

In the first place as the transcript of the record appears to have been made up under the new rules we refer to the directions given to the clerk for making up the transcript to ascertain if the plaintiff in error purposely omitted to

direct the clerk to copy the entry in the court minutes showing that the defendant ·was arraigned and pleaded to the indictment. The instructions required the clerk to copy the "papers· and records" named and "no others," leaving out of the transcript "all papers, records and proceedings in said cause not herein named." The record of arraignment, pleas and personal presence of the defendant at the trial is not included among those records which the clerk is directed to copy. Hence we conclude that he purposely omitted it from the transcript. And as there could be no valid judgment in the case, the charge of which the defendant was convicted being a felony, unless he was arraigned, pleaded to the indictment and was personally present at his trial, the conclusion is that he was arraigned, pleaded not guilty and was present during his trial, because the judgment is presumed to be correct.

The first assignment of error is that the court erred in not permitting the defendant to withdraw his plea of not guilty and interpose a plea in abatement and motion to quash the indictment. The bill of exceptions shows that at a special term of the court held August 23, 1921, the indictment was returned and the defendant was asked by the court if he had an attorney? He replied that he had not; that he was able to employ counsel but had not done so because he thought that he did not need counsel that he was thereupon arraigned and pleaded not guilty. That at the regular October Term, he asked through his counsel, permission to withdraw his plea "because it was entered unadvisedly before he had employed an attorney for his defense," and because he desired to file a plea in abatement and a motion to quash the indictment. The court refused to permit the plea to be withdrawn, to which ruling the defendant excepted. The plea in abatement was not ten-

dered with the motion, nor was any ground given as the basis for the motion to quash.

The indictment sufficiently charges the offense of incest under our statute. It charges that on a day certain the defendant in the county of Hardee and State of Florida "did have sexual intercourse with Fannie Mercer, that the said Fannie Mercer was then and there the own daughter of said Lewis Mercer and the said Lewis Mercer was then and there the own father of the said Fannie Mercer." Sec. 5414 Rev. Gen. Stats. 1920; Brown v. State, 42 Fla. 184, 27 South. Rep. 869; McCaskill v. State, 55 Fla. 117, 45 South. Rep. 843. It is in the discretion of the court to allow a plea of not guilty to be withdrawn in order to plead in abatement. See Savage v. State, 18 Fla. 909; Adams v. State, 28 Fla. 511, 10 South. Rep. 106; Knight v. State, 44 Fla. 94, 32 South. Rep. 110. A plea of not guilty is a waiver of the right to plead in abatement in a criminal case. See Hodge v. State 29 Fla. 500, 10 South. Rep. 556.

No abuse of discretion is shown, so the first assignment of error fails.

The second assignment of error is as follows: "The court erred in admitting improper evidence on the part of the State over the objection of the defendant, to-wit, Cross-examination of defendant's witness, W. D. Henderson. Bill of exceptions, page 21; also Bill of Exceptions page 18 State witness Isabel Henderson." Assuming that the assignment is definite enough to merit consideration, it attacks two rulings of the court, and under the rule it will be unavailing unless both rulings are erroneous. See Eggart v. State, 40 Fla. 527, 25 South. Rep. 114; Bass v. State, 58 Fla. 1, 50 South. Rep. 531; Williams v. State, 58 Fla. 138, 50 South. Rep. 749; Peeler v. State, 64 Fla.

385, 59 South. Rep. 899; Davis v. State, 66 Fla. 349, 63 South. Rep. 847. There was no error in the court's ruling allowing the question to be propounded to the witness Isabelle Henderson. The question was in cross-examination, but the answer she gave rendered the interrogation harmless, even if the question to which objection was made was improper. As to the other rulings embraced in the assignment it is referred to in such general terms that it is impossible to state to which part of the testimony of the witness W. D. Henderson the assignment relates. The assignment refers to page 21 of the bill of exceptions. Turning to that page one finds that a question in cross-examination was propounded to the witness who was called for the defense. An objection to the question was made upon the ground that the "question" was "immaterial." The objection itself was too vague to be considered. See Griswold v. State, 77 Fla. 505, 82 South. Rep. 44. But it was over-ruled and the defendant excepted, the witness answered in the negative and thus denied the implication if any there was in the question.

The next question propounded was not answered after the objection was made, but was reshaped, to which there was no objection. There was no error however, in the question last propounded. The witness was on cross-examination. He had testified upon direct examination that he lived at one time with his wife in the same house with defendant and his children, and that he had never noticed any acts or conduct on the part of defendant that showed any improper relations with his daughter, and that Fannie Mercer was living there at the same time. On cross-examination he was asked if he did not leave the house because his wife had told him that Lewis Mercer had told Fannie to "lay that trouble" on him. His reply was a question

which was as follows: "She told her?" Then follows the question: "Yes, Fannie told her, your wife told you, and that is the reason you left." A. "That is part of the reason." There was no objection to the last two questions, no exception and no motion to strike the answer. To the question as first propounded the objection was that it was "immaterial." We have held that an objection so general would not be considered unless the answer elicited by the question was inadmissible for any purpose or harmful. The question sought information contradictory of his direct testimony. The witness had said that he had observed no conduct on the defendant's part that showed any improper relations with his daughter, yet he moved away from the house, not because of such improper relations, but because of the personal danger to which he was subjected on account of such relations, The question was adroitly framed, it presupposed a knowledge on the witness' part of that which he had disclaimed any knowledge of and sought to elicit from him the fact that through fear of his becoming a vicarious sacrifice he left the house. If appropriate objections had been made to the question it would doubtless have been sustained; but the information which was obtained from the witness might have eventually been secured by other questions.

The third assignment of error is based upon a ruling sustaining an objection made by the State Attorney to a question propounded by defendant's counsel to the prosecuting witness Fannie Mercer. There was no error in that ruling. Upon direct examination the witness had said that the defendant had committed the act with which he was charged several times. Upon cross-examination the fact was emphasized, and the further fact developed that the first time the defendant committed the offense was after the death of the witness' mother. The following

question was asked: "Just a time before your mother died didn't you tell that your father did this? haven't you told that? Objection to this question was interposed upon the ground that if counsel wished to impeach the witness he had not laid the proper predicate. Defendant's counsel then disclaimed any such intention, but asserted that he merely desired to ascertain the date when the defendant committed the offense the first time. If such was the real purpose of the question, he cannot complain of the ruling, for it certainly was not harmful. However, the objection was fully removed by subsequent questions, to which there were no objections, and from which the fact was fully developed that the defendant had been committing the offense for more than a year, and that the first time he did it was about two weeks after the death of the witness' mother, the defendant's wife.

It cannot therefore be maintained that the court's ruling constituted reversible error even if it be admitted that it was wrong, where the matter sought to be elicited was afterwards testified to by the witness without objection. See Owens v. State, 65 Fla. 483, 62 South. Rep. 651.

The fourth assignment of error is too general to be considered. The assignment is that the court erred in "permitting the State's Attorney to examine a witness in an improper manner over objections of defendant, to-wit: The cross-examination of Isabel Henderson, a State witness, by the State's Attorney." It is not pointed out either in the assignment or in brief, nor does the record disclose in what the impropriety of the examination of the witness consisted. Isabelle Henderson was called by the State, her testimony was given, and the defendant's counsel took her upon cross-examination, during which it was developed that defendant was cruel to his daughter in the matter of

chastisement, often using a leather belt or strap and inflicting wounds and bruises upon her. In this cross-examination the fact was also disclosed that the witness and her husband lived in the house with the defendant and his children, but that she left about a week after the girl Fannie told her about her father's conduct. Thereupon the defendant's counsel asked the witness the following question: "You had opportunity to know the condition of Fannie as regarding her developement at the time you were living there regarding her development as a woman?" And she answered as follows: "she was not." There is no mental sequence indicated by the words used in the foregoing question and answer. It is difficult to interpret the reply, but the State Attorney evidently concluded that the witness had turned hostile to the cause which she was called to support, and on "re-direct" examination asked her for an explanation of her testimony if she intended by her answer to the last question in cross to say that she knew from a personal examination of the girl what her genital development was. Just what the State Attorney's manner was in conducting the examination is not disclosed by the record nor by brief. The questions were not objectionable. The evidence sought to be elicited was in explanation of that brought out upon the cross-examination and the court's ruling was correct. The objection as shown by the record was, that the State Attorney tried to cross-examine his own witness. There was no merit in the objection. Assignments of error predicated upon alleged facts and rulings that are not disclosed by the record cannot be considered. See Douberly v. State, 51 Fla. 41, 40 South. Rep. 675; Kilgore v. State, 69 Fla. 397, 68 South. Rep. 378; Kersey v. State, 73 Fla. 832, 74 South. Rep. 983.

The fifth assignment of error is abandoned.

The sixth and seventh assignments of errors question the sufficiency of the evidence to support the verdict. It would be useless to review the testimony in the case. If the testimony of the girl is to be believed there was ample evidence to support the verdict. Conviction of a person charged with incest may be obtained upon the uncorroborated testimony of the person with whom he committed the offense. See Brown v. State, *supra.* Same rule applies in the State of Iowa. See State v. Stalker, 169 Iowa 396, 151 N. W. Rep. 527. 1915 E. L. R. A. 1222.

We have discovered no error in the record, so the judgment is hereby affirmed.

WHITFIELD AND WEST J. J., concur.

BROWNE, C. J. AND TAYLOR, J., dissent.

BROWNE, C. J., dissenting:

The offense with which the defendant is charged is a heinous and detestable one. If he is guilty, the penalty imposed upon him, although it is the extreme limit of the law, seems insufficient.

It is, however, a charge easily made, and extremly *difficult* to disprove. Under the harsh rule laid down by this court that the complaining witness' story needs no corroboration, it is almost *impossible* to disprove.

The father positively denied the charge.

The complaining witness testified that her father whipped her rather severely at times. This he admitted. He says: "I was stern with all my children and I have tried to raise them right as far as I was able and had the ability."

"It may have been that I was rather cruel, that is, in punishment, you understand,—I did'nt mean to go over it all the time. It does not do any good to whip a child and then have to go back and whip her again. I never told one that I was going to whip it without I did. I tried to be positive. That is the basis I have built upon ever since I had a family. I have got six boys and this little girl that was here on the stand against me, and although she comes up here I love the child. I can't help it."

Other testimony on this point is as follows:.

Fannie Mercer testified: "Q. And had the care of all these children? A. Yes, sir, I had to take care of all them. Q. And keep house? A. Yes, sir. Q. And look after the getting of the meals? A. Yes, sir. Q And be the general house keeper? A. Yes, sir. Q. Just do all that work around there? A. Yes, sir. Q. And these little fellows you had to take care of? A. Yes, sir. Q. And your father didn't appreciate it very much? A. Not much. Q. He punished you severely? A. Yes, sir. Q. When you was negligent or didn't do things the way he thought you ought to he would punish you? A. Yes, sir. Q. Did he strap you? A. I say he did. Q. With a belt sometimes? A. Yes, sir, and oak switches. Q. And make bruises on you? A. Yes, sir, he has. Q. He would do that when he thought you didn't take care of the baby just right or wouldn't do things just to suit him; he would treat you that way when you didn't do things to suit him, get meals to suit him or take care of the baby the way he thought you ought to, he would jump on you with a belt or strap and flog you until it would raise bruises over your body? A. Yes, sir. Q. And that didn't make you feel very affectionate towards him? A. No, ma'am, it didn't. Q. Then you didn't want to stay there? A. No, ma'am, I

didn't. Q. You wanted to get away because he punished you so? A. Yes, sir. Q. Your aunt left? A. She stayed with us and left a little while before I went to the orphanage. Q. Probably a month before or a few weeks before? A. I don't know. Q. The idea was, you wanted to get away from that old lonesome place out there where you had to work so hard and was punished so severly? A. Yes, sir.''

Mrs. Henderson testified: ''Q. Tell us about his treatment of her, A. Well, he whipped her pretty severely and he was pretty strict. He started her to school and he had her stopped on account of my health, and he was strict on her. He whipped her rather hard, and he wouldn't allow any privilege to go like she wanted to go. She thought she ought to have more privileges and he was careful with her and she thought he was hard on her, and he did whip her severely at times. Q. What would he use? A. Sometimes he would use his belt and sometimes a strap. He was too hard on her and I think that is mostly the trouble now. Q. Did you ever see any bruises or hurts on her caused by these whippings? A. Yes, sir, I have. Q. What did he whip her for? A. He whipped her several times for being late on the school grounds and he whipped her several times for neglecting these children and when I would bring her in and show him how she would do. Q. Raised bruises and whelps? A. Yes, sir. Q. Tell us how many in the family, living in the house, at that time. A. There was ten of us. Q. How many rooms had the house? A. Four room house. Q. All of you lived together; just intermingled there as one family? A. Yes, sir. Q. Fannie's duties there were, of course, to take care of the children? A. Yes, sir, she had to take care of all of them. I just seen that she did. Q. Who took care of the baby at night? A. She

did. Q. She would sleep with the baby and take care of the baby? A. Yes, sir. Q. She did the cleaning up around the house and worked mighty hard? A. Yes, sir. Q. Did the washing and most of the ironing? A. Yes, sir.. Q. Did the cooking? A. Yes, sir. Q. And took care of five babies and her father used to whip her when you would take her in there and show him she had slovened over the house? A. Yes, sir. Q. She was cooking for you and your husband and five children and her father and doing the washing and ironing and taking care of the house? A. Only what little I could do. Q. And he whipped her for neglecting the baby? A. At night. Q. And all that you saw her father do he was acting as a kind and loving father? A. And whipping her severely. Q. And on top of that, you showed him where she hadn't done things right? A. Yes, sir. I thought she ought to be raised right.''

Carmine Mercer testified: ''Did he punish her severely? A. Yes, sir. Q. What would he punish her with? A Leather. Q. Belt strap? A. Yes, sir. Q. What would he punish her for? A. Sometimes about her work and sometimes about being late at school. Q. Son, you say he whipped her about being late on the road from school and slovening on her work? A. What do you mean by that? —she would just lay on the road a good many times and didn't get her work done.''

This would seem to afford a motive for the charge this girl brought against her father.

During five months of the period when it is claimed the misconduct was taking place, the defendant's married sister and her husband lived in her brother's home. It was a four room house, and ten persons occupied it. There

could have been very little privacy, and the happenings therein hardly concealed.

Another occupant was the girl's sixteen year old brother, and he and her aunt and her husband, testified that they saw no indication of any wrong doing or misconduct on the part of the father.

The aunt testified that after having lived in the house with them for five months, and not having witnessed anything to indicate any wrongdoing of this character, her neice made this charge against her father.

It is inconceivable that this child's aunt, who went to live with them "as a mother to the children" would not have taken steps to investigate, and if she had the slightest reason for believing the child's story, would not have taken steps to rescue her. Any woman who was not a brute or a degenerate would have done this, and there is nothing in the testimony to indicate that the child's aunt comes within that classification.

Against the father's postive denial and the corroboration by his married sister and her husband and his sixteen year old son, we have the complaining witness, whose examination in chief with regard to the offense consists of the monosyllables, "Yes, sir" and "No, sir," in reply to catagorical questions propounded by the State Attorney. There is not a particle of testimony in relation to the charge, in the words of the complaining witness herself.

This is all there is of it that seeks to describe the offense: "Q. Fannie, before you went down to Doctor Trice's did your father ever treat you wrong? A. Yes, sir. Q. Tell these six men here just what your father did; just go on in your own way. What did he do to you, Fannie?—what

did he do?—just tell these men in your own way just what he did to you. A. I told you one time. Q. But you didn't tell these six men there. They are the ones that want to know. A. He bothered me at night and wouldn't let me rest, and whipped us when the least thing happened and was mean to us. Q. What did he do to you at night and wouldn't let you sleep? A. I don't like to say that. Q. Fannie, do you know what is meant by your private part? A. No, sir. Q. Just tell these six men just what he did do; just go on in your own way and tell us what happened to you. Did your father ever go and get in bed with you? A. Yes, sir. Q. What did he try to do to you when he got in bed with you? A. I don't know how to say that word. Q. Did he get on you, Fannie? A. Yes, sir. Q. Did he ever put anything in you? A. Yes, sir. Q. In your private part, between your leg? A. Yes, sir. Q. You are sure of that? A. Yes, sir. Q. Now, you say that he did go and get in bed with you? A. Yes, sir. Q. And. got on top of you? A. Yes, sir. Q. And put something between your legs. Did he put it in you Fannie? A. Yes, sir. Q. How many times did he do you that way? A. I don't know; I couldn't tell you. Q. More than once? A. Yes, sir. Q. More than two or three times? A. More than that. Q. Did he put his thing from between his legs in you, that night? A. Yes, sir. Q. Did he do that just before you went down to Doctor Trice's place? A. Yes, sir. Q. Just before you left home? A. Yes, sir. Q. You are sure of that? A. Sure.''

Her testimony seems to be that of an imbecile, or one whose mentality has not developed beyond that of a six year old child, and she seems to belong to the class of deficients who fill psychopathic wards in asylums; the very

type from which charges of this character generally eman-ate.

A corroborative detail—in support of my view, that this girl is a mental deficient, is her twice replying "No Ma'am" to questions propounded by Mr. Garrison. It may seem a slight matter, but it is from such slight indicia that the degree of mental development in children, is determined.

A conviction of so grave an offense—one so unusual and so very unnatural, ought not to be affirmed except upon testimony of the clearest and most unequivocal character. I know of no class of cases where "corroboration" is more essential, if justice is to prevail. If her story is true there must have been, observant to some of the inmates of this small house, corroborative details, to give verisimilitude to this bald and unconvincing charge. On the other hand, if the father is innocent, how can he establish it? I think the judgment should be reversed on the facts.

TAYLOR, J., concurs.