97 So.2d 115 (1957)
Albert KNIGHT, Appellant,
v.
The STATE of Florida, Appellee.
Supreme Court of Florida.
September 25, 1957.
*116 V.R. Fisher, Tampa, for appellant.
Richard W. Ervin, Atty. Gen., Jos. P. Manners and David U. Tumin, Asst. Attys. Gen., for appellee.
STURGIS, District Judge.
A jury found appellant, defendant below, guilty of incest committed upon the person of his daughter, a minor, whose testimony was not corroborated. The Criminal Court of Record in and for Hillsborough County (Grayson, J.) sentenced him to fifteen years in the state penitentiary. This appeal is from that judgment.
The prosecutrix claimed that her father committed the incestuous acts over a sixteen month period, except for a five month interval during which she lived in a Salvation Army home while pregnant and following delivery of a child admittedly sired by one other than her father. She was rigidly cross examined in respect to her mental condition and actions prior to, during and following the alleged incestuous acts. In an effort to develop an inference of animosity toward her father, she was asked if she had at a time prior to the alleged crime made representations to the effect that her father murdered her twin brother, and she denied doing so. To impeach this testimony and show animosity of the prosecutrix toward her father, the defense proffered testimony of two witnesses to the effect that she did make such representations. The refusal of the court to permit this testimony to go to the jury is assigned as error.
Several weeks after prosecutrix lodged the complaint she was committed to the Florida Industrial School for Girls at Ocala, where she developed a mental disorder resulting in transfer to a Tampa hospital for treatment, from which she was discharged on September 15, 1954 and returned to the Industrial School. The disorder recurred and on October 11 she was again placed in the Tampa hospital for treatment, from which she was discharged on November 1 and returned to the Industrial School. She promptly became violent, was adjudged insane, and on November 5 was committed to the state hospital for the insane at Chattahoochee, from which she was discharged the latter part of January 1955, approximately two weeks before the trial.
As part of its evidence in chief the state produced Mr. Forrest Orr, a psychologist in its employ at the Chattahoochee hospital. He was permitted to testify that while prosecutrix was a patient there he gave her certain tests resulting in a finding that her intelligence was in the high average to superior range. On cross examination he testified that he found her to be a person in great need of personal attention, and in the course of further cross examination the state's objections were sustained to each of the following questions:
"Q. Is it further, from your examination as a psychologist and examining her, that she would go to great lengths to secure and get that attention?
"Q. Did you make a finding in that, and isn't it your personal opinion right *117 now, that she would even fabricate and falsify in order to gain attention?
"Q. Didn't you write a report then and in that report, didn't you state that because of this girl's great desire for attention that she would go to great length, even to the extent of falsifying and fabricating in order to secure it?"
These rulings were assigned as error.
As further evidence in chief the state produced Dr. Marshall C. Sexton, a psychiatrist in the employ of the state hospital, who over objection of the defense was permitted to testify that while the prosecutrix was a patient in the state hospital she complained to him of an incestuous relationship with her father; and over objection the doctor also testified that he injected her with sodium amytal, a drug commonly known as "truth serum", having the propensity of making a person "more likely to tell the truth", with the result that while under its effect she reiterated the complaint. Appellant insists that his assignment of error No. 20 presents for review the question of the competency of this evidence. The state pertinently argues that the assignment of error is distinguished more in the breach than in the observance of the rule prescribing the contents of assignments of error. See Johnston v. State, 29 Fla. 558, 10 So. 686; Berger v. E. Berger & Co., 76 Fla. 503, 80 So. 296; Kloss v. State, 95 Fla. 433, 116 So. 39; Dewey v. State, 135 Fla. 443, 186 So. 224; Mortellaro v. State, Fla., 72 So.2d 815; Redditt v. State, Fla., 84 So.2d 317. It is only because the fundamental rights of the individual are so seriously affected by this phase of the proceedings below that we are constrained to ignore appellant's failure to comply strictly with the rule. This relaxation must not be interpreted as license or invitation for future violations of it.
Conviction of incest may be sustained upon the uncorroborated testimony of the prosecutrix. Mercer v. State, 83 Fla. 555, 92 So. 535. The implications of this principle make it imperative, however, that the accused be accorded every right designed by law to protect the liberties with which the citizen is clothed.
There is no direct precedent of this court relating to admissibility of testimony as to findings based on so-called truth serum tests. In the related case of Kaminski v. State, Fla., 63 So.2d 339, 340, decided November 14, 1952, the trial court was held in error for permitting a state witness merely to testify that he had taken a lie detector test, and absent any testimony as to the results of such test.
We find no authority recognizing either of such tests to the extent that would justify the courts in admitting testimony reflecting the results in rehabilitation or corroboration of a witness. In the case on review, as in Kaminski v. State, supra, the only purpose of the testimony elicited from the psychiatrist and psychologist was to rehabilitate the credibility of the prosecutrix. The state's whole case depended upon her testimony and its credibility was subject to determination exclusively in the discretion of the jury. As stated in the Kaminski case:
"* * * there can be no doubt that in initiating the inquiry the prosecutor intended to leave in the minds of the jurors the impression that because the witness Newbold had voluntarily submitted to a lie detector test prior to the time of trial he was a man of veracity and hence was telling the truth from the witness stand, no matter how inconsistent his tale might appear to be to the jurors when compared with the testimony offered by other State witnesses.
"Can it logically be argued that the putting of the questions and the allowance of the answers under the circumstances prevailing at the trial did not have a direct and profound tendency to influence or prejudice the minds of the jurors against the defendants? * *

*118 "It was not fair to place the defendants in the entrapped position that required them at their peril either to pursue the inquiry as to the nature of the results of the test or to be damned by the adverse impressions which naturally would be expected to flow from their failure to do so. The practical effect of the admission of the testimony, as fortified by the remarks of the trial judge when he overruled the objection, was to allow, by inference, the admission of damaging evidence that would not have been legally admissible had it been submitted directly. In a situation where the State's whole case depended entirely upon the testimony of a witness whose credibility appears to have been seriously shaken not only by cross-examination but by evidence given by other State's witnesses as well, the defendants should not have been placed in this intolerable position.
"(2) Whatever the guilt or innocence of the defendants may ultimately prove to be, there can be no escape from the fact that at the trial they were entitled to the presumption of innocence with which the law clothes all persons accused of crime until proven guilty beyond a reasonable doubt by legally competent evidence. The successful attempt by the prosecution by the means employed to implant in the minds of the jury the impression that because the witness had voluntarily submitted to a lie detector test prior to trial he must perforce be testifying truthfully in the course of the trial, resulted, in effect, in the substitution of a mechanical device, without fair opportunity for cross-examination, for the time-tested, time-tried, and time-honored discretion of the judgment of a jury as to matters of credibility."
Every postulate from this quotation has greater significance and applies with greater force in this cause. The expert witnesses were permitted not only to show that the so-called credibility tests were given the prosecutrix but gave their interpretation of the results as well. There is no scientifically recognized drug that inevitably causes its subject to speak the truth. The so-called "truth serums", including hyoscine hydrobromide, sodium amytal, evipan sodium, nembutal, scopolaimine, and sodium pentothal, are said to effect states of altered consciousness, so that the subject's ability to associate thoughts and give them inhibited expression is impaired; but no such drug insures pure truth. It is said to produce merely an uninhibited state of mind in which the subject is prone to relate facts not deliberately altered. In 5 University of Florida Law Review 6 (1952) it is said:
"Along with those facts, however, fantasy unfolds; and here lies one of the greatest objections to the accuracy of the truth serum. Since the truth is mixed with impressionistic creations peculiar to the subject, the reliability of any truth serum testimony will depend mostly upon the examiner's interpretive skill and experience. Without such experts, therefore, there is not even a scientific acceptance of the serum's reliability. Moreover, in order for truth serums to bridge the experimental-demonstrable gap, there must be a showing that while the subject is under the influence of such drugs there can be no intentional fabrication. The courts so far have indicated a distrust for the assertion that the subject has no control over his utterances, by regarding statements made under influence of the drug as merely self-serving declarations."
In State v. Hudson, Mo. 1926, 289 S.W. 920, 921, which appears to be the first American case to consider such drugs, the court observed:
"Testimony of this character  barring the sufficient fact that it cannot be otherwise classified than as a self-serving declaration  is, in the present state of human knowledge, unworthy *119 of serious consideration. We are not told from what well this serum is drawn or in what alembic its alleged truth-compelling powers are distilled. Its origin is as nebulous as its effect is uncertain. A belief in its potency, if it has any existence, is confined to the modern Cagliostros, who still, as Balsamo did of old, cozen the credulous for a quid pro quo, by inducing them to believe in the magic powers of philters, potions and cures by faith. The trial court therefore, whether it assigned a reason for its action or not, ruled correctly in excluding this clap-trap from the consideration of the jury."
The term "truth serum" is a misnomer. There is no specific serum which will cure or reveal deception or infallibly induce truth. While scientific developments confound the most skeptical, the fundamental rights of the individual should not be jeopardized by precipitate acceptance of devices that smack too closely of brainwashing. We agree with State v. Lindemuth, 1952, 56 N.M. 257, 243 P.2d 325, 336, in which it is said:
"Until the use of the drug as a means of procuring the truth from people under its influence is accorded general scientific recognition, we are unwilling to enlarge the already immense field where medical experts, apparently equally qualified, express such diametrically opposite views on the same facts and conditions, to the despair of the court reporter and the bewilderment of the fact finder."
The view we adhere to was followed in the recent case of Lindsey v. United States, 9 Cir., 237 F.2d 893, 895, decided May 7, 1956, in which the trial court was reversed for having permitted the government to attempt to rehabilitate the prosecutrix who was chief witness for the government in a prosecution for statutory rape and sodomy. To accomplish that end the government called a psychiatrist who was permitted to testify, on the basis of a complete clinical examination including batteries of psychological and personal tests and a sodium pentothal test, that in his professional opinion the girl was telling the truth when she repeated on direct examination the charges originally made by her. The court said:
"Here the Government's witness was subjected to psychiatric examination for the avowed purpose of determining whether the story originally told the authorities was the truth. Obvious motive existed then to repeat that story. So if the original story were indeed a fabrication, it would be unreasonable to hold that motive did not exist to fabricate during the test insofar as will could assert itself."
This observation is equally applicable to the case on review.
The psychologist, Mr. Orr, having been allowed to testify, the right of cross examination should not have been restricted by refusing to permit him to answer the questions hereinbefore quoted in regard to the findings and the report thereon as made by the witness. Cross examination of a witness upon the subjects covered in his direct examination is an invaluable right which stems from the constitutional right of the accused to be confronted by his accusers. Coco v. State, Fla., 62 So.2d 892.
The use of the psychologist and the psychiatrist, for the sole purpose of shoring up the testimony of the chief witness for the prosecution, is hardly distinguishable from trial by compurgation,  the test based on who "gits thar firstest with the mostest." Justice is not at war with the citizen.
For the reasons stated, the judgment appealed from is reversed and a new trial awarded.
*120 TERRELL, C.J., and HOBSON and DREW, JJ., concur.
THORNAL, J., concurs with opinion.
THORNAL, Justice (concurring).
I concur in reversal for the reasons so cogently expressed in the opinion prepared by Mr. Associate Justice STURGIS. My own conclusion, however, is influenced by the additional fact that the brief of the Attorney General for the State concedes that the testimony relating to truth serum tests would not have been held admissible by the courts of any state. A verbatim quotation from the brief of the appellee is the following:
"The State is in accord and recognizes that most authorities realize certain short-comings in the use of such drugs. By the reduction of a person's critical senses, the drug often results in an outpouring both of truth and fantasy equally, thereby making the use of such testimony quite questionable. See 5 University of Florida Law Review 6 and 14 University of Chicago Law Review 601. The State also recognizes that truth serum tests occupy much the same position as lie detector tests, and no court has as yet recognized the admissibility of the results of such tests. See 23 A.L.R.2d 1306, at page 1310."
While we are requested to view the admission of this testimony as harmless error, it appears to me that it could hardly be considered harmless when the mental capacity, competency and veracity of the prosecutrix were in issue and the highly objectionable testimony was employed to support her mental capacity and veracity. Under such circumstances it would seem that the State's concession that the permitted testimony would be considered improper by every court in the land is for all practical purposes a confession of error.
TERRELL, C.J., concurs.