243 P.2d 325

**STATE v. LINDEMUTH.**

No. 5223.

Supreme Court of New Mexico.

April 9, 1952.

Frederick L. Nohl, Albuquerque, for appellant.

Joe L. Martinez, Atty. Gen., Walter R. Kegel, Asst. Atty. Gen., for appellee.

SADLER, Justice.

This appeal is prosecuted by the defendant to secure reversal of a conviction suffered by him at a trial in Bernalillo County as a result of which he was sentenced to the state penitentiary for life.

The trial and subsequent conviction of defendant grew out of the finding near Albuquerque on August 16, 1948, of the partially decomposed body of a young woman later identified as Lucille Ramirez. She was a nurse employed at County Hospital in Modesto, California, and had come to Albuquerque where her father resided arriving on the evening of July 22, 1948, seeking to locate her brother, Luis Ramirez who had telephoned her he was in trouble.

She went to a tourist court, where she had learned the defendant and her brother were rooming, about 10:30 o'clock that night, found the brother absent and was seen to talk to the defendant a few minutes and leave in a taxi which had carried her there. She then disappeared.

When discovered the body was lying on its back about half a mile north of Central Avenue, west of and near the Rio Grande, concealed by underbrush about six feet in height. An examination disclosed a bullet wound, sufficient to cause death, in the back of the head, a large jagged hole in the left temple marking exit of the bullet. Clothing worn by deceased at time of her death appeared in a state of disarray, with her panties on the ground some fifteen feet away.

Shortly thereafter the defendant was arrested in Harrisburg, Pennsylvania, his home town. A suitcase, her nurse's pin and key case, all belonging to the deceased, were found in his possession, and a wrist watch which also belonged to her was found in that city at a shop where the defendant had pawned it. In addition, a baggage tag with her name on it which had been on her suitcase was found in an Albuquerque hotel room which the defendant had occupied for a time, after registering as "Teco Ramirez," the night after she arrived in Albuquerque. "Teco" was the nickname of the defendant.

The claim of error primarily relied upon by the defendant for reversal grows out of the admission in evidence at the trial of three statements or confessions made by him following his return to Albuquerque from Harrisburg, Pennsylvania, his home, where he had been arrested charged with the murder of the deceased. Sheriff's deputies Hay and Slaughterbeck had journeyed to Pennsylvania to get the accused and return him to New Mexico. He waived extradition and at various times during the return trip, which consumed about four and a half days, he was questioned by the officers concerning the murder charge; making admissions conforming in many material respects with the written confessions later obtained.

The accused and the two deputies mentioned arrived in Albuquerque on the return trip from Harrisburg, Pennsylvania, about 2:00 p.m. of the fifth day, which was on Saturday. He was placed in a cell in the county jail at once. About an hour later he was taken from his cell to the office of the district attorney in the county court house for questioning. The following were present: A newspaper reporter, district attorney M. Ralph Brown, assistant district attorney Harry D. Robbins, district attorney's investigator Henry Espinosa, sheriff Harold Hubbell, Slaughterbeck and Hay, and Mrs. Helen K. Dunlap, a stenographer in the office of the district attorney who acted as stenographer in taking down

the questions asked the defendant by the assistant district attorney and the answers made thereto.

The interrogation of the defendant was begun by asking him a few preliminary questions of the kind usually employed for purposes of indentification such as his name, place of residence, age (18 years), date of birth and the like. It was conducted in question and answer form and was taken down in shorthand by a stenographer from the office of the district attorney who, as later shown, transcribed her notes of the hearing and presented same for reading, correction and signing by the defendant. The questions were asked by the assistant district attorney in an orderly and somewhat formal albeit considerate fashion, free from any suggestion of coercion, browbeating or intimidation. Indeed, the assistant district attorney had done no more than get the defendant identified as to name, age, date of birth and the like, before warning him formally of his constitutional rights, such as the right to have counsel, to speak out or remain silent, and to talk only freely, voluntarily, and of his own accord, if at all, as hereinafter shown in greater detail.

After more questioning of the defendant as to his father and mother, the state of their health, etc., the questioner gradually came to the point in the case and secured his confession that he accompanied the brother and sister to the place of the killing and saw the brother shoot and kill his sister and drag her body back into the bushes where it would not be seen; that the brother had taken her wrist watch and money, and had divided the money with him. He also detailed other incriminating facts. At this point the questioning ended and a recess was taken while Mrs. Dunlap, the district attorney's stenographer, transcribed her notes of the somewhat lengthy questioning. It consisted of 36 pages of legal size paper, double spaced, in question and answer form.

The defendant remained in the office of the district attorney throughout, being served a steak dinner while awaiting completion of a transcription of the notes of his questioning. When the transcribed notes were returned to him for examination he read the entire statement, making numerous corrections in pen and ink in his own handwriting. It was 10:30 p.m., by the time this somewhat tedious detail was finished, whereupon the defendant was returned to his cell in the county jail, having already signed the statement. It was identified in evidence as plaintiff's Exhibit 28.

It is to be observed from a recital of this statement, taken on Saturday evening, August 28, 1948, that while admitting guilty knowledge through presence at scene of the crime and the sharing in a division of the money taken from the body of deceased, he accused her brother, Luis Ramirez, of firing

the fatal shot that killed his sister, claiming to have witnessed the shooting. Obviously, dissatisfied with this statement of what had transpired, deputies Hay and Slaughterbeck questioned the defendant further at the jail in the county court house the following afternoon and evening, being Sunday, August 29th. During the course of this interrogation the clothes taken from the deceased's body following its discovery were exhibited to the defendant in the finger-print room on the fourth floor of the county court house opposite the jail cells. It served as an office for deputy Slaughterbeck.

The talks with defendant on the 29th, Sunday, began around 2:30 or 3:00 o'clock in the afternoon and were carried on from time to time, though not constantly, until the deputies left before supper for their respective homes. They returned to the county jail after supper that evening for further talks with defendant. Here it should be said that enroute to Albuquerque from Pennsylvania the defendant had stated to the deputies that deceased's brother, Luis Ramirez, was in possession of her watch and that if they would check the pawn shops on South First Street in Albuquerque they would find the watch. In the meantime, however, they had been advised by officers in Harrisburg, Pennsylvania, that the watch had been located in a pawn shop there.

Accordingly, and soon after the beginning of the talks with defendant after supper that evening, the deputies confronted him with the fact that the watch had been found in Harrisburg. It was then that he asked for a pencil and some paper, saying he wanted to write his father and mother a letter. They gave him a pencil and some paper and he was returned to his cell. In about an hour he sent for them and they went upstairs where he handed them the letter and asked that they mail it to his father and mother. They told him they would hand it to the district attorney the following day and it was up to him to say whether it would be mailed or not, as it later was. Then, the defendant said:

"Now, don't ask me any questions, leave me alone and I will write out the facts in this case."

They gave him a pen and paper and at that time and in the presence of the officers he wrote out the statement, plaintiff's Exhibit 29, in his own handwriting and signed the same. His signature was witnessed by deputies Hay and Slaughterbeck.

It was in this statement, written entirely in defendant's own handwriting and in his own words, that he admitted killing the deceased and taking $100 from her purse, and as well, removing her ring, watch and a few other personal articles from her body. The statement also related that prior to the homicide the deceased had called

at the room occupied by defendant and her brother in a cabin back of La Fonda Bar in Albuquerque at a late hour on the night of July 22, 1948; that she announced to him she was searching for her brother and finding him absent left, after giving defendant the name of her hotel for the brother's benefit; that shortly, thereafter, the defendant had contacted deceased at her hotel and, on the pretext of taking her to the brother at the home of the latter's uncle on North Ute Road, had lured her to the scene of her death and there killed her.

The next day, Monday, August 30th, the defendant made and signed still another typewritten statement consisting of one page in narrative form, known as plaintiff's Exhibit 30, clearing up and changing certain details in the two former statements. Preliminary to giving it, he was taken again to the office of the district attorney where all those present at his first statement on Saturday were once more gathered. It was witnessed by Helen K. Dunlap, stenographer in the office of the district attorney who had typed it and by one Esther Jiminez. In it, the defendant again admitted the slaying and told of throwing away the gun he used a short distance out of St. Louis, as he rode a bus toward his home at Harrisburg, Pennsylvania, following the slaying. The statement also acquitted the deceased's brother, Luis Ramirez, of any part in the slaying and admitted he had never even told him that his sister was in town when he saw him the morning after killing her. This statement also recited that he had told his father and mother in the letter to them the day before that he did not kill the girl but was going to take the blame—this in order to make them feel better over the matter.

Following the signature of defendant and those of the two witnesses to his signature the defendant of his own accord and notion wrote out in longhand and signed the following statement:

"The statement I made on Aug. 29, 1948 at 10:30 p. m. is the correct statement."

Having heard the witnesses on a voir dire examination, the trial judge found the three statements, plaintiff's Exhibits 28, 29 and 30, were not the result of threats, force, coercion or hope of reward, concluded they were given freely and voluntarily and admitted them in evidence. The chief claim of error on this appeal arises from this ruling of the trial court. Counsel for defendant argue with great vigor and earnestness that the court should have held on admitted facts, adduced on cross examination of the state's main witnesses on this issue, that the written confessions were involuntary because induced by hope of reward inspired by promises of leniency, and as well by persistent questioning under conditions amounting to force and coercion.

The defendant's contentions, therefore, are dual in character. First it is charged

he was questioned at such length and so constantly on the return trip from Harrisburg, Pennsylvania, to Albuquerque, that it amounted to a form of physical torture. It is pointed out that practically four and a half days were consumed in returning from Harrisburg, whereas only two days were needed to go there. We are also told that the foully smelling clothes taken from deceased's body were exhibited to him and kept in such proximity in a small room during the questioning that as a result he gave the written statement known as plaintiff's Exhibit 29. So much for the claim as it relates to physical coercion.

On the other phase of this claim of error, the hope of reward, it is said implied promises of immunity arise by operation of law on what the officers told defendant on the long drive back to Albuquerque from Harrisburg, Pennsylvania. In substance, he was told that it was always better to tell the truth, and several instances were mentioned of where defendants charged with less serious offenses had told the truth and been treated leniently; also one instance of where a defendant charged with murder, by telling the truth and pleading guilty to second degree, had been sentenced to a long term in the penitentiary as against a possible death sentence for first degree murder. Such is the substance and *it is all* that can be claimed for the testimony relied upon by the defense in this particular. The question is did it, viewed in the light of other testimony in the case, call upon the trial judge to rule as a matter of law that the written confessions were involuntary and not entitled to go to the jury? In our opinion, it did not. Now for the reasons on which that opinion rests.

No serious contention is made that the defendant was not adequately advised of his constitutional rights, both before any questioning began following his return to Albuquerque and also as a preliminary to any interrogation of him enroute there from Pennsylvania. The form of the warning given by the assistant district attorney, practically at the beginning of the first session of questioning in Albuquerque, was as follows:

"At this point I must under the law instruct you as to what your rights are. Under the Constitution of the United States you do not have to tell us anything if you don't want to. You have a right to have a lawyer. Now, are you willing to tell us whatever you know about this matter at this time? A. Yes, sir.

"Q. Voluntarily and freely? A. Yes, sir.

"Q. You understand what voluntarily and freely is? A. Yes, sir.

"Q. We offer you nothing. We promise you nothing. We just would like to have you tell us this story if you wish to of your own accord. Are you willing? A. Yes, sir."

Pressing the witness on cross-examination as to any warning given while enroute to Albuquerque from Pennsylvania, deputy Hay was asked the following questions and received answers thereto as indicated, to wit:

"Q. Where did you ride in the car? A. Well, we took turns driving; Charlie drove a while and I drove a while.

"Q. Where was Franklin? A. In the back.

"Q. You rode with him all the time? A. Yes, sir.

"Q. During this time did you question him? A. We talked to him, yes, sir.

"Q. And questioned him about this alleged crime? A. Yes, sir.

"Q. What did you tell him as to his rights during that time? A. What I told you before; that anything that he would say, or anything he told us would be used against him, and he had the right to have an attorney, and we wouldn't take any statement from him whatsoever; whatever he told when he got back to Albuquerque, if he wanted to make a statement freely and voluntarily it was up to him."

That the defendant himself well understood he was under no duress or compulsion in answering questions seems well established. This is demonstrated by an excerpt from testimony he gave on his voir dire examination about first questioning upon arrival in Albuquerque in custody of the two deputies who had gone to Pennsylvania for him. Note this question and his answer thereto:

"Q. And who discussed with you your right to give a statement or to refuse to give one? A. Well, I am not sure who did, but all along someone had told me that I didn't have to do nothing I didn't want to do, that they wouldn't force me to do nothing; they just said I didn't have to do anything I didn't want to do."

Earlier on his voir dire while discussing his interrogation on the trip from Pennsylvania and the possibility of the trial judge giving him a lighter sentence (none of which testimony the judge was compelled to believe), he quoted the deputies thus: "they said they would not promise me."

■ A careful review of all the testimony on the subject dispels any doubt to arise, from reading the brief on this issue filed by defense counsel, as to the correctness of the action of the court in admitting the three written statements, plaintiff's Exhibits 28, 29 and 30, in evidence for appraisal by the jury. There was here no such constant and long drawn out questioning of defendant on the auto trip from Pennsylvania to New Mexico as was calculated to cause him to speak "because he is

overborne." Indeed, each deputy denied the questioning was constant and defendant, himself, on his voir dire virtually refutes the claim that it was. Nor is significance to be attached to the fact that the officers consumed four and a half days in returning a dangerous prisoner, stopping overnight each 24-hour day, which they had been able to drive, traveling night and day, in little more than two days when going after him.

In none of the questioning, either at Albuquerque or on the auto trip from Pennsylvania, was there anything which even approached the "suction process" of interrogation involved in Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 1357, 93 L.Ed. 1801, a case greatly relied upon by counsel for defendant. The actual questioning which preceded defendant's signing of plaintiff's Exhibit 28 consumed no more than 1½ to 2 hours. The remainder of the time between then and the signing was occupied by the stenographer in transcribing her notes, by the defendant in consuming a steak dinner and the time he took to read the statement and make corrections therein.

Nor was there anything approximating physical torture in the fact that the officers exhibited to defendant by opening before him for a period not exceeding ten minutes the box containing the ill smelling clothes taken from deceased's body. At the end of that time the lid was again placed on the box and it was put back on top of a cabinet where it had remained continuously since being brought from the undertaker's prior to the departure of deputies Slaughterbeck and Hay for Pennsylvania. The room was not, as defendant's counsel would have us believe a tiny one, but approximately 12x18 in size and served as Slaughterbeck's office. As the Attorney General argues, the clothes were wrapped up and in a box with a lid on it, and were kept permanently in that office on top of a cabinet. He observes aptly that they could not have been too vile smelling, "else either the clothes or Slaughterbeck would have had to yield the office completely to the other."

The defendant's counsel place much reliance upon statements from our opinion in the cases of State v. Dena, 28 N.M. 479, 214 P. 583, and State v. Lord, 42 N.M. 638, 84 P.2d 80, 84. In the Dena case we said that a confession induced by promises of leniency, express or implied, is involuntary as a matter of law and should be so declared and ruled out of evidence. In State v. Lord we said:

"A confession made by a person accused of crime, induced by the promise held out to him by a person in authority, that if he would confess, his punishment would not be so severe as it otherwise would be, is not admissible in evidence because not voluntary."

We have nothing to repudiate in our holdings in either of these cases except as the holding in State v. Dena, supra, has been modified to some extent in the later case of State v. Wickman, 39 N.M. 198, 43 P.2d 933. The facts in the Dena case are quite different from those here present. There the defendant Indians, who could not speak English were told they would not be "hurt" if they confessed. Taking into consideration their lack of education, inexperience, simple mindedness and inability to speak or understand English, we held confessions so secured from these defendants were induced by the promise made and should have been excluded as involuntary. We have no such situation in this case by the record before us. Admittedly, no direct or express promise to aid defendant in any way was ever made. Contrarily, the defendant was expressly told by the officers they could make him no promises.

As to State v. Lord, it should be pointed out that notwithstanding the language quoted, supra, in that very case the confession of a defendant 17 years of age, as shown by the record, at the time he made it, was admitted in evidence by the trial court as prima facie voluntary and a sentence of death following conviction (later commuted by the Governor to life imprisonment) was affirmed by this court on the appeal from such conviction.

Whether or not confessions should go to the jury "is in the first instance a question of law for the determination of the court." State ·v. Ascarate, 21 N.M. 191, 153 P. 1036, 1039, and State v. Anderson, 24 N.M. 360, 174 P. 215. And as we said in State v. Wickman, supra [39 N. M. 198, 43 P.2d 937]:

"We consider it too much to say that the judge must imply a promise where none was probably intended, perceived, or relied upon."

While realizing that decisions of the United States Supreme Court are binding on us where rights under the federal constitution are invoked and shown to have been violated, as illustrated in Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 1357, 93 L.Ed. 1801, cited and quoted in defendant's brief; nevertheless, this case and others which could be cited do no more than hold that where it can be said as a matter of law the tendered confession is involuntary, it will be rejected. Otherwise, it becomes a matter for the jury under proper instructions. No complaint is made of the instructions here given in this behalf. The trial court properly held the matter to be issuable in this case as it did also in State v. Lord, supra. There is no disagreement on our part with the language quoted from the Lord case. Of course, a confession induced by a promise to an accused of a lighter sentence from a person in authority is inadmissible because involuntary. The question whether it was so induced where there is no direct promise·

and one must be inferred, if at all, from conflicting evidence, is still one for the jury. In affirming the judgment in the Lord case, we necessarily so held.

■ We think there was no error in admitting the confessions in evidence. State v. Anderson, supra; State v. Lord, supra; State v. Wickman, supra; State v. Jenkins, 56 N.M. 12, 239 P.2d 711; State v. Marty, 52 N.D. 478, 203 N.W. 679; Mainer v. State, 151 Tex.Cr.R. 532, 208 S. W.2d 900; United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. ——, and Gallegos v. Nebraska, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. ——. The two decisions of the United States Supreme Court are cited by us as supporting authority on a certain point in State v. Jenkins, supra.

The unanimous opinion of the court in United States v. Carignan [342 U.S. 36, 72 S.Ct. 99] furnishes facts enough like those here present touching the claim of implied promises to warrant us in quoting from it at some length. The defendant while being detained on an assault charge by the police of .Anchorage, Alaska, was questioned by the United States Marshal about an earlier and unsolved crime of murder, from a conviction of which the matter was later brought before the high court on certiorari. Although the Government confessed error for failure to permit examination of defendant apart from the jury touching involuntary character of the confessions, the court felt called upon to speak out on issuable character of the evidence then before the court on voluntariness of the confessions. Among other things, it said:

"The night of Friday, September 16, Carignan was lodged in the city jail. The next morning, Saturday, Herring, the United States Marshal, undertook to question respondent in regard to the earlier crime of murder. No evidence appears of violence, of persistent questioning, or of deprivation of food or rest. Respondent was told that he did not have to make a statement, and that no promises could be made to him one way or another. There were pictures of Christ and various Saints on the walls of the office in which the conversation occurred. The Marshal evidently suggested to him that his Maker might think more of him if he told the truth about the crime. The evidence also shows that the Marshal told Carignan that he, the Marshal, had been in an orphan asylum as a youth, as had Carignan. On respondent's request a priest was called. The accused talked to the priest alone for some time and later told the Marshal he would give him a statement. After his return to the jail about 5 p. m. on Saturday, he was left undisturbed.

"On Sunday he was not questioned, and on Monday morning the Marshal again took respondent out of jail and

into the grand jury room in the courthouse. Upon the Marshal's inquiry if he had any statement to make, respondent answered that he had but that he wished to see the priest first.

"After talking to the priest again for some time, he gave the Marshal a written statement. The statement was noncommittal as to the murder charge. Two other police officers who were with the Marshal and Carignan then suggested that perhaps Carignan would rather talk to the Marshal alone. They withdrew. The Marshal told Carignan, in response to an inquiry, that he had been around that court for twenty-seven years and that during that time 'there had been no hanging, what would happen to him I couldn't promise him or anyone else.' There was also some talk about McNeil Island, the location of the nearest federal penitentiary, and the Marshal said, in reply to a question of Carignan's, that he, the Marshal, 'had known men that had been there and learned a trade and that made something of their lives.' After a few moments further conversation Carignan completed the written statement that was later put in evidence. It then admitted the killing.

"Whether involuntary confessions are excluded from federal criminal trials on the ground of a violation of the Fifth Amendment's protection against self-incrimination, or from a rule that forced confessions are untrustworthy, *these uncontradicted facts do not bar this confession as a matter of law.* The constitutional test for admission of an accused's confession in federal courts for a long time has been whether it was made 'freely, voluntarily, and without compulsion or inducement of any sort.'" (Emphasis ours.)

In endeavoring to protect the rights of accused persons, the courts must not become so strict in the matter of interrogating them as seriously to handicap peace officers and prosecutors in their efforts to solve crime. Neither should the courts countenance efforts to secure confessions from suspects by coercion, brutality, promises of reward or other like means sometimes employed in criminal investigations. The facts of many cases will place them in a twilight zone of doubt and uncertainty where it is truly difficult to say as a matter of law whether the prohibited line has been crossed. The "hope of reward" cases are less difficult to pass upon than those involving brutality and physicial torture. This happens to be a case of the former kind. Again we say the court did not err in holding the confessions were admissible in evidence.

But, argue defense counsel, even if the ruling of the trial judge admitting the confessions seems otherwise correct, he displayed such confusion over certain language in our opinion in State v. Wickman,

supra, that he was in no position to rule advisedly or properly on the voluntary character of these confessions at the time he announced his ruling thereon. At that time he stated:

"Our Supreme Court said the duty of the trial judge, under the situation faced by the court here, 'The question for the judge here is whether, under all the circumstances, the influence was strong enough to cause an innocent man to confess falsely.' The influence being the duress or the hope of reward.

"The question as to the admissibility of the confessions is, was such force used as to cause an innocent man to confess falsely. The three confessions, or alleged confessions, offered in evidence here, State's Exhibits 28, 29 and 30, in each one of them the defendant confesses his guilt to a major crime. In one he appears to be only the accessory, and in the other appears to be a principal, but in all, the result of the testimony as taken on the voir dire here today, the defendant or his counsel have not at one single point protested his innocence.

"They have pointed out discrepancies, they have denied things were true in general, but not once has it been urged upon the court that an innocent man has been forced or urged to confess falsely.

"According to the present state of the record the court is prepared to admit State's Exhibits 28, 29 and 30 when they are introduced, after proper foundation is laid before the jury."

One of defense counsel then reminded the judge that the defendant had entered a plea of not guilty, to which the judge replied that he appreciated that fact. Proper exception was then taken to the action of the court. It is said the trial judge entertained the view that even though he believed the statements were involuntary, he must further believe they were untrue before he could exclude them, in other words, that an innocent man had confessed. If such was his belief, of course, it was an erroneous appraisal of what we said in the Wickman case. In saying what we did there we simply were restating an often declared standard employed by trial courts in passing upon the admissibility of purported confessions of a defendant. If it should be determined by the trial court that the influence was sufficient to cause an innocent man to confess, then it was its duty to decline to allow such confession to go to the jury, but if not sufficient to accomplish such result, then it would be its duty to admit it.

Whether the trial judge entertained the view of our holding in the Wickman case attributed to him by counsel, we are not prepared to say. It seems to us more likely that he was placing the question of a de-

fendant's innocence on the same plane with that of voluntariness of the purported confession, i. e., to be established prima facie only in a preliminary fashion (the mere claim of innocence being sufficient for such purpose) before entertaining defendant's objections to its admission. But be that as it may we do think his language about the case reflects confusion and misapprehension as to what we meant by the language he quoted in his remarks. Nevertheless, we see no reversible error. In spite of any views entertained about the Wickman case, he made an absolutely correct ruling on admissibility of the confessions when he admitted them. Their exclusion would have been error. They were not involuntary as a matter of law.

Nothing he said about the Wickman case could have had the slightest influence in testing whether the confessions were voluntary or involuntary. Furthermore, everything said on the subject took place out of the presence of the jury and he made no mention of it in his instructions. The jury never heard of his remarks. Hence, it could not have been influenced in the slightest degree in reaching its verdict by any misapprehension of the judge about the Wickman case. We have spent more time in dealing with this claim of error than it merits.

The writer took over authorship of the opinion in this case from Mr. Justice McGhee when a majority of the court disagreed with his views on admissibility of the confessions. The proposed opinion submitted by him dealt not only with admissibility of the confessions but also with errors assigned as to other rulings of the trial court which he resolved in a manner entirely satisfactory to all members of the court. Accordingly, the discussion of all other errors assigned is given next exactly as submitted by him save as to the very last paragraph hereof which affirms rather than reverses the judgment of the trial court.

The defendant also claims that the trial court erred in failing to sustain his motion for a directed verdict at the close of the state's case in chief on the ground the state had failed to prove the corpus delicti. Disregarding the confessions for purposes of such proof, as the state was bound to do, State v. Dena, supra, there was proof that the body of Lucille Ramirez had been found in thick brush in an isolated spot near the Rio Grande in Bernalillo County with a bullet hole in the back of her head which a medical expert testified in his opinion caused her death; the defendant had talked to her the night of her disappearance and had left the city where sojourning, Albuquerque, three days after her disappearance; a suitcase tag with the name of the deceased on it had been found in a room occupied by the defendant and a woman companion a night or so after the disappearance of the deceased; the suitcase

of the deceased was found in possession of the defendant at his home in Pennsylvania, and also a watch belonging to the deceased had been pawned by him on his arrival there from Albuquerque. These facts were sufficient to establish the corpus delicti and take the case to the jury. State v. Smith, 51 N.M. 328, 184 P.2d 301. The assignment is without merit.

█ The defendant offered to prove by narcoanalysis that his testimony given on the witness stand that he did not kill the deceased was true. The evidence of Dr. Gore, a psychiatrist, was taken in the absence of the jury to show that when sodium pentathol was administered to any one in the proper amount and by one skilled in the work, the truth could be obtained from the person to whom the drug had been administered, and that such was a fact generally recognized in medical circles. Dr. A. B. Stewart, also a psychiatrist of Albuquerque, was called as a witness for the state to refute the testimony of Dr. Gore, and he did so in a manner which was convincing to the trial judge. The offered evidence through Dr. Gore was rejected by the trial court on the ground that such tests were not reliable or generally approved and accepted by members of the medical profession specializing in psychiatry.

The defendant assigns error on the refusal of the trial judge to permit Dr. Gore to testify that he administered sodium pentathol to the defendant on September 23, 1948, and then questioned him on many points, and as a result of this examination it became very clear that the defendant not only did not kill Lucille Ramirez, but that the confessions he made were false, and that he told a true and accurate story of his connection wtih the case which was identical in all respects to the story he told on the witness stand.

The defendant frankly states that no court, so far as he knows, has held such testimony admissible, but says it is time some court did so. He quotes from Herzog, Medical Jurisprudence, § 472, on the results obtained by scopolamine as a crime detector, in which instances are given where the truth was obtained, and the article supports its use, but even it says wrong answers may be obtained if insufficient amounts of the drug are administered and that wrong answers may also be obtained when the subject has either not yet reached the examination stage or has passed out of it.

On the other hand, the state produced an article entitled "The Judicial Use of Psychonarcosis in France" printed in the Journal of Criminal Law and Criminology, Vol. XL, No. 3, page 370, from which we quote:

"Professor Delay and the majority of Psychiatrists assert that psychonarcosis is not able to check the determined will of concealing a precise point, while

Dr. Scharlin, chief of the Neuropsychiatric department of the Regional Hospital Department of Besancon, gives the following results of about a hundred experiments which have been undertaken under conditions similar to those which are met with in judicial matters. In 12% cases the results prove completely satisfactory; for instance, a miner subjected to narcosis said the following: 'It's queer your stuff; makes one talk all right, the murderers need to be mighty careful with you.' In 30% cases the examination is only able to obtain precisions on secondary details, as the will controls the important answers; finally, in about 60% cases, the results are completely negative."

The article further states:

"In France, psychonarcosis has never been used for obtaining a suspect's confession, except in a few experiments which have no judicial value."

The American Journal of Psychiatry, Vol. 107, No. 8, February, 1951, issue, pp. 586–593, has an article by Frederich C. Redlich, M.D., Professor of Psychiatry, Yale University School of Medicine, Leonard J. Ravitz, Jr., M.D., and George H. Session, LL.D., Lines Professor of Law, Yale Law School, on experiments made on nine persons who had intravenous injections of sodium amytal and were questioned while under its influence. Each of the subjects had a true and a cover story. We quote from page 589 of the article:

"It is of interest that the 3 subjects diagnosed as normal (i. e., persons who perform adequately in their various functions, have good defenses and no highly pathological characteristics) maintained their cover stories. Of the 6 subjects diagnosed as neurotic, 2 promptly revealed the true story; 2 made partial admissions, consisting of a complex pattern of fantasy and truth; one admitted what most likely was a fantasy as truth; and the one obsessive-compulsive individual maintained his cover story except for one parapraxia, (faulty or blundering action). We were particularly struck by the fact that G. U. and S. S., who confessed readily, had strong unconscious guilt feelings.

"The fantasies under sodium amytal can be understood only in the light of intimate knowledge of the subjects' unconscious processes. Such fantasies produced during the sodium amytal interview at times had the character of a confession as in the case of K. D., who confessed to beating the plumber, while in reality probably only the subject was beaten. Such fantasies are similar to dreams and daydreams; at times they have a highly symbolic character as in

C. Y. when she spoke of the disgusting beard of a sexualized father figure, while this particular person in reality had no beard. * * *."

The Supreme Court of Missouri in State v. Hudson, Mo.Sup., 1926, 289 S.W. 920, refused the offered testimony of a doctor that he had administered truth serum to a defendant, and the answers made to questions asked while under the influence of the drug. The court, in an interesting opinion, rejected the claim of error on account of the refusal to admit such testimony, classifying it as a self-serving declaration and unworthy of consideration in the present state of human knowledge.

We agree that the courts should keep step with scientific developments, but believe the statements in State v. Bohner, 210 Wis. 651, 246 N.W. 314, 317, 86 A.L.R. 611, are applicable to this case and reflect our present views. We quote:

"It seems to us that this statement offers little comfort to one who contends that this device is past the experimental stage. While it may have some utility at present, and may ultimately be of great value in the administration of justice, it must not be overlooked that a too hasty acceptance of it during this stage of its development may bring complications and abuses that will overbalance whatever utility it may be assumed to have. The present necessity for elaborate exposition of its theory and demonstration of its practical working, in order to convince the jury of its probative tendencies, together with the possibility of attacks upon the soundness of its underlying theory and its practical usefulness, may easily result in a trial of the lie detector rather than the issues in the cause. If the defendant in a criminal case is to be permitted to have tests taken outside of court and then to produce expert testimony as to the results of the tests when these are favorable to him, without the necessity of taking the stand or submitting to tests by the prosecution, the way would seem to be open to abuses that would not promote the cause of justice. It is our conclusion that the refusal of the trial court to admit this testimony was not error."

Statements made by a defendant while under the influence of sodium pentathol were held inadmissible as self-serving and hearsay by the District Court of Appeals of California in People v. McNichol, 100 Cal. App.2d 554, 224 P.2d 21.

We conclude that the trial court did not err in refusing to admit the testimony of Dr. Gore by which it was sought to show the questions asked the defendant and answers made by him while he was under the influence of the drug.

Until the use of the drug as a means of procuring the truth from people under its

influence is accorded general scientific recognition, we are unwilling to enlarge the already immense field where medical experts, apparently equally qualified, express such diametrically opposite views on the same facts and conditions, to the despair of the court reporter and the bewilderment of the fact finder.

When Dr. Stewart was called to the stand in the absence of the jury the trial judge announced he was familiar with the doctor's qualifications and it would not be necessary to question him concerning them. The defendant did not object to such action or express his dissatisfaction in any way, so his claim of error on that point cannot be considered here.

It follows from what has been said that the judgment of the trial court is correct and should be affirmed.

It is so ordered.

COMPTON, J., and HARRIS, District Judge, concur.

McGHEE, Justice (dissenting in part).

I concur in the foregoing opinion except the part holding the statements or confessions were voluntary and admissible in evidence.

The law relating to the admission of confessions has been stated many times by this court, and, with one exception, the cases are essentially in agreement, until today. We need go no further back than State v. Dena, 28 N.M. 479, 214 P. 583, 584, where in an opinion by Mr. Justice Bratton it was stated:

"* * * It has been many times declared by this court that confessions which are made without being induced by threats, duress, coercion, fear, hope, promise of reward or immunity, but from the voluntary volition of the accused, become admissible, and the fact that appellants were under arrest or were not represented by counsel is immaterial. The two leading principles of exclusion applicable to confessions were fully and thoroughly discussed in Territory v. Emilio, 14 N.M. 147, 89 P. 239, wherein Justice Parker announced the first to be that, when such confessions are induced by promises or threats, hope or fear, the temptation to speak falsely is so great as to render the statements so made entirely untrustworthy, and the second being that that portion of the Fifth Amendment to the Constitution of the United States which provided that 'no person shall be compelled in any criminal case to be a witness against himself' excluded involuntary confession, but when they are freely and voluntarily made, without being induced by promises or threats, hope or fear, duress or coercion, both doctrines of exclusion are met and

overcome, and they are then admissible. * * * "

In the Dena case the defendants, who were Indians, had been told by a deputy sheriff if they told the truth they would not be hurt. They then confessed they had committed the crime for which they had been arrested, but this court held such confessions inadmissible in evidence because of such statement by the deputy and granted them a new trial.

In the case of State v. Woo Dak San, 35 N.M. 105, 290 P. 322, this court affirmed the judgment of conviction but refused to modify its former holdings on the admission of confessions which, it said, were quite strict.

The question was next before this court in State v. Wickman, 39 N.M. 198, 43 P.2d 933, in which this court in a rather labored opinion held the confession admissible, and, it might well be said, modified or clouded the former opinions on the subject. I do not wonder the trial judge was confused by certain parts of the opinion.

This court, however, in the later case of State v. Lord, 42 N.M. 638, 84 P.2d 80, reviewed the older cases, as well as the Wickman case, and approved the Emilio and Dena cases. The admission of the confession in the Lord case was affirmed, but apparently only because the facts were not fully developed. Stress is laid upon the responsibility of the trial judge in the admission of confessions and his duty to see that the facts in connection with their procurement be fully developed, to the end that a confession improperly obtained shall not be admitted in evidence. Then the opinion quotes from State v. Foster, 25 N.M. 361, 183 P. 397, 398, 7 A.L.R. 417 and approves the following statement there made:

"There is no more convincing evidence to the ordinary man than a confession of guilt, and where a confession is admitted, under an instruction to the jury to determine whether it is voluntary or involuntary, and to consider it in the former case, or in the latter case to reject it, the probabilities are, unless the confession was extorted under circumstances calculated to arouse sympathy for the defendant, that the average jury will consume but little time in determining the question of whether the confession was voluntary or involuntary, but will in the great majority of cases say the prisoner has confessed, and therefore is guilty beyond a reasonable doubt."

In this latter case an inspector of the Cattle Sanitary Board admitted he had promised the defendant if he would confess and clear up the theft he would not be prosecuted, and yet, although the inspector's statement was not denied and there was no testimony connecting the defendant with the

theft except his own confession and the disappearance of the cattle from their accustomed range, the jury disregarded the instruction of the court on the subject and promptly returned a verdict of guilty, which this court reversed.

At the time I submitted an opinion in the present case holding the trial court erred in admitting the confessions, the latest applicable case from the Supreme Court of the United States was Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 1348, 1357, 93 L.Ed. 1801, wherein it was said:

"On review here of State convictions, all those matters which are usually termed issues of fact are for conclusive determination by the State courts and are not open for reconsideration by this Court. Observance of this restriction in our review of State courts calls for the utmost scruple. But 'issue of fact' is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication. Hooven & Allison Co. v. Evatt, 324 U.S. 652, 659, 65 S.Ct. 870, 89 L.Ed. 1252 [1260], and cases cit-

ed. Especially in cases arising under the Due Process Clause is it important to distinguish between issues of fact that are here foreclosed and issues which, though cast in the form of determinations of fact, are the very issues to review which this Court sits. (Citing cases.)

"In the application of so embracing a constitutional concept as 'due process,' it would be idle to expect at all times unanimity of views. Nevertheless, in all the cases that have come here during the last decade from the courts of the various States in which it was claimed that the admission of coerced confessions vitiated convictions for murder, there has been complete agreement that any conflict in testimony as to what actually led to a contested confession is not this Court's concern. * * * Therefore only those elements of the events and circumstances in which a confession was involved that are unquestioned in the States's version of what happened are relevant to the constitutional issue here. But if force has been applied, this Court does not leave to local determination whether or not the confession was voluntary. There is torture of mind as well as body; the will is as much affected by fear as by force. And there comes a point where this Court should not be ignorant as judges of what we know as

men. See Taft, C. J., in the Child Labor Tax Case (Bailey v. Drexel Furniture Co.), 259 U.S. 20, 37, 42 S.Ct. 449, 450, 451, 66 L.Ed. 817 [819] 21 A.L.R. 1432."

This case was decided June 27, 1949, and it may be it was so old when the Alaska and Nebraska cases cited in the majority opinion were filed that it was ripe for reversal, but I consider its holding sound. But, disregarding the Watts case, I believe our own cases require a holding the confessions were inadmissible under the admissions wrung from Deputy Hay during an exceedingly long cross-examination. I quote therefrom in part:

"Q. Didn't you cite numerous cases to him where you had gotten people off with light sentences because they cooperated and done what you told them? A. I didn't tell him anything about a murder case, getting anybody off.

"Q. Did you tell him about any other case? A. I might have told him about some other cases, yes, sir.

"Q. Where you had got them off with a light sentence where they cooperated? A. Not where they cooperated, where they went before the judge and told the truth, they got leniency.

"Q. You told him about that? A. Yes, sir.

\*     \*     \*     \*     \*     \*

"Q. But did you tell him about cases where people had gotten off easy by talking, and coming in and telling the court the truth, isn't that right? A. They always get off easier if they tell the truth and go before the judge.

"Q. You told him about that? A. Yes, sir.

\*     \*     \*     \*     \*     \*

"Q. \* \* \* You once stated you did discuss with him, and did tell him about cases where he makes a confession and went up before the judge and got off easier? A. We talked about a lot of cases, but not murder cases.

"Q. You told him about armed robbery? A. Yes, that is right.

"Q. And how they come up and confessed before the judge and got off with a lighter sentence? A. Yes, sir.

"Q. Or maybe say a misdemeanor, a liquor violation, you go up before the judge and confess and get off easy? A. Sometimes the judge is lenient.

"Q. You told him about those various kinds of things? A. Yes, sir.

"Q. Did you tell him about the Benevides case? A. I don't believe I did. I don't recall. Slaughterback might have told him something about it, but I don't remember telling him about it. I told him we worked the case.

"Q. Did you tell him what Benevides got? A. I believe we did. I think he got seventeen to thirty-five years.

"Q. Did you tell him what crime Benevides was involved in? A. I told him, yes.

"Q. Do you recall what the crime is now? A. Well, he was charged with—he pled guilty to second degree murder, I believe.

"Q. Did you show him a magazine article concerning the Benevides case? A. No, he asked for it and we didn't give it to him."

A,fter the court announced the statements would be admitted, the jury was brought into the court and the witness again examined regarding the confession. We quote further from his cross-examination:

"Q. Don't you recall telling him about different cases in which people have come in and confessed to crimes and got off with light sentences? A. Yes.

"Q. You told him about those? A. Some of them.

\*       \*       \*       \*       \*       \*

"Q. You were a little more definite this afternoon about the cases you told him about where people got off with light sentences by coming before the judge and pleading guilty? A. No. I

told you this afternoon I talked to him some about it. I don't know what all, I haven't got a memory that long.

\*       \*       \*       \*       \*       \*

"Q. Now, Mr. Hay, I would like to again, in connection with the discussions and conversations you had with Mr. Lindemuth, again refer to the testimony concerning discussions of cases where shorter prison terms were obtained by confession. As I recall there is some inconsistency as to the testimony on yesterday afternoon and last night. Do you recall ever having discussed cases of that type with the defendant, Franklin Lester Lindemuth? A. We discussed several cases, I wouldn't say how many. Charlie talked to him a while and I talked to him. I don't know what Charlie talked about, all I can tell is what I talked about.

"Q. Your testimony of last night that you do not recall having discussed them is corrected now? A. I said last night that I don't recall the different cases we brought up; that we talked about some of them.

"Q. And do you now recall specifically discussing the Benevides case? A. It was brought up, but to what extent, I don't know exactly what was said."

Notwithstanding the statement in the majority opinion that it would have been error

had the trial court excluded the confessions, I feel they have, perhaps unconsciously given too much weight to the finding of the trial court that such confessions were voluntary. I feel its action in that regard was controlled by its erroneous view of the Wickman case. I admit certain of its language might lead a trial judge astray. He should, however, have followed the later case of State v. Lord and the Emilio and Dena cases therein approved. The trial judge could only find the confessions voluntary or involuntary, and feeling the Wickman case required him to find an innocent man had confessed in order to find the confessions were involuntary (in this instance by hope of leniency induced by the statements of the officers), he concluded the defendant had not shown himself innocent and therefore the confessions were voluntary. I base this statement on the following excerpts from the transcript of testimony, all taken out of the hearing of the jurors:

"The Court: I have read these statements in full. I would like to ask the defense counsel if they contend that State's Exhibit 28 is in substance untrue?

"Mr. Nohl: Yes, sir.

"Mr. Murphy: We contend that it is untrue in many respects, if the Court please, some of which were brought out on cross examination of the state's witness.

"Mr. Brown: No, it wasn't.

"The Court: Say that again, Mr. Murphy; don't interrupt.

"Mr. Murphy: with reference to registering under the name of Lucille Ramirez.

"The Court: What about the substance, except for that mistake in the first name of the registration 'Teco'?

"Mr. Murphy: That is generally untrue.

"The Court: You contend it is generally untrue?

"Mr. Murphy: 29 and 30 we contend are admittedly untrue, almost exclusively.

"The Court: You contend 29 is untrue and admit 28 is true, do you?

"Mr. Nohl: No, sir.

"Mr. Murphy: Not necessarily, if the Court please.

"The Court: What about State's Exhibit 30?

"Mr. Murphy: That is generally untrue.

"The Court: There is nothing in the testimony here from this witness about the untruth of any of this except minor details, except as to State's Exhibit 29; the witness says 28 and 30 are substantially the truth, as stated in the testimony you have offered here.

"Mr. Murphy: No, if the Court please, I am sure I asked him if the facts contained there were true, if the reporter could find that.

"The Court: As to some minor points. You have pointed out the word 'Lucille' was used in place of the word 'Teco,' and some other minor points.

"Mr. Murphy: The effect of his testimony, I asked him (the defendant) if the statement was generally true, and he said no. I didn't feel like taking every item on the 37 page document, and questioning him as to its truth or accuracy. If the Court so desires I will proceed in that manner. But we would point out the fact that would indicate that they were not the words of the witness in fact, but the words of the examiner.

"The Court: No, I don't think I want to hear any more evidence on this. I am not denying you the right to produce any further evidence, but I thought you have rested. Do you have anything besides the testimony of Mr. Lindemuth that you want to offer?

"Mr. Nohl: No, sir.

"Mr. Murphy: If the Court please, in order that the record may be clear on that statement, I would like your permission to ask about three more questions.

"The Court: All right.

"By Mr. Murphy:

"Q. Mr. Lindemuth, are the statements contained in Plaintiff's Exhibit 28, dated August 28th, substantially and generally correct? A. No, sir.

"The Court: Well, let him explain that further.

"Mr. Murphy: I just want to make that clear. I might be in error in the record not containing that.

"Q. Is the information contained in Plaintiff's Exhibit 29, dated on Sunday, August 29th, at ten thirty P.M., generally true? A. No, sir.

"Q. In detail, in reference to State's Exhibit 29, have you at any time since—did you have with you a gun, while on the bus enroute to Harrisburg from Albuquerque? A. No, sir.

"The Court: That is in State's Exhibit 30.

"Mr. Murphy: That is correct.

"(Then followed testimony in which the witness disputed the correctness and truth of all three exhibits.)

"Q. What was your motive for signing these papers? A. From everything I heard, it seemed to me I could save myself from going to the chair.

"Q. You felt you would avoid the chair by signing the papers? A. Yes, sir.

"Q. Did the magazine story concerning the Benevides case affect you in any manner? A. Well, from the way they said, he would have got the chair if he had pled not guilty, but they said, Mr. Hay, he talked to his mother and father and the lawyers, and got him to plead guilty, and that when you plead guilty you couldn't go to the electric chair.

"Mr. Murphy: You may question.

"The Court: The state will waive the right to question, on instructions from the bench. You may be excused, Mr. Witness.

"Witness Excused.

"The Court: Does the defense have anything else?

"Mr. Murphy: Nothing else.

"The Court: I will hear you briefly on your argument.

"Whereupon the Court heard the argument of counsel on said matter, after which the following proceedings were had, still out of the hearing of the jury:

"The Court: I am not willing to decide at this time whether the state has proved a corpus delicti independent of any alleged confessions. I don't think that is before the Court. I will hear counsel on that point again, and let defense counsel raise it at the time the state rests. But since the law of New Mexico is that the order of proof is discretionary with the trial court, I see no prejudice to the defendant even were I prepared to admit that the corpus delicti has not been proved here.

"Now the situation given me by counsel is the one I was hunting for out of the Wickman case. Our Supreme Court said the duty of the trial judge, under the situation faced by the court here, 'The question for the judge here is whether, under all the circumstances, the influence was strong enough to cause an innocent man to confess falsely.' The influence being the duress or the hope of reward.

"The question as to the admissibility of the confessions is, was such force used as to cause an innocent man to confess falsely. The three confessions, or alleged confessions, offered in evidence here, State's Exhibits 28, 29 and 30, in each one of them the defendant confesses his guilt to a major crime. In one he appears to be only the accessory, and in the other appears to be a principal, but in all, the result of the testimony as taken on the voir dire here today, the defendant or his counsel have not at one single point protested his innocence.

"They have pointed out discrepancies, they have denied things were true in general, but not once has it been urged upon the court that an innocent man has been forced or urged to confess falsely.

"According to the present state of the record the court is prepared to admit State's Exhibits 28, 29 and 30 when they are introduced, after proper foundation is laid before the jury.

"Mr. Murphy: If the Court please, I would like to call to your attention that a plea of not guilty has been entered.

"The Court: I appreciate that.

"Mr. Murphy: The admission of the statements are excepted to by the defense.

"(The jury was reconvened and then recessed. After they retired the following proceedings were had:)

"The Court: The court further finds that no undue influence was used upon the defendant; that no duress was used; that he was advised of his constitutional rights before he made a statement, and that he was warned, before he signed any statement, that the statement would be used against him.

"Accordingly the court concludes from the facts and the law that the three alleged confessions, State's Exhibits 28, 29 and 30 are admissible.

"The court has heretofore expressed in open court to counsel for the defendant the opinion that the defense has every right to produce testimony concerning the taking of these alleged confessions, and testimony concerning any alleged duress or alleged undue influence, and that the question of the truth of the matters in the alleged confessions will be a question for the jury, under proper instructions from this court."

At the risk of unduly lengthening this dissenting opinion, heavy quotation has been made from the record in the belief of the writer that the nature and extent of the trial court's error of law is best shown in context.

As the proceedings just quoted were had while the jurors were absent from the courtroom they, of course, had no effect on them; but, as stated by this court in the Foster case, there was little hope the jurors would waste time considering whether such confessions were voluntary.

The question of the weight to be given the findings of fact of a trial judge who has been influenced in making them by an erroneous view of the law has been considered by other courts. It is stated in 3 Am.Jur. (Appeal and error) Sec. 904, p. 472:

"The rule that an appellate court will not disturb the findings of fact made

by the trial judge unless they are manifestly against the weight of the testimony, does not apply if he committed an error of law which manifestly influenced or controlled his conclusions of fact, as where he makes a mistake as to the onus probandi or commits an error in the exclusion of evidence. The appellate court will always review the findings of the trial judge when they were manifestly controlled or influenced by error of law. It is not bound by the finding of the trial court on oral evidence based upon an erroneous view of the law as applied to the facts. A finding of facts which is contrary to a conclusion of law resulting from other facts found must be disregarded."

In the following cases cited in support of the above text, findings of fact were overturned although there was testimony to support them, because an erroneous view of law influenced or controlled the conclusion of the trial court: Wheeler v. McKeon, 137 Minn. 92, 162 N.W. 1070, 1 A.L.R. 1514; Hall v. Hall, 41 S.C. 163, 19 S.E. 305, 44 Am.St.Rep. 696; Chase v. Woodruff, 133 Wis. 555, 113 N.W. 973, 126 Am. St.Rep. 972; Boardman v. Lorentzen, 155 Wis. 566, 145 N.W. 750, 52 L.R.A.,N.S., 476; Truelsch v. Northwestern Mut. Life Ins. Co., 186 Wis. 239, 202 N.W. 352, 38 A. L.R. 914.

I am convinced the statements of defendant were induced by statements of the deputies of light punishment given defendants in other cases where they had confessed, with the hope and expectation he would likewise receive a light sentence. I am further convinced the finding of the trial judge that such was not the case, in effect, and that the statements were voluntary was because of his belief that only an innocent man could object to the admission of a confession, and that the defendant was required to prove his innocence before invoking a ruling of the trial court thereon.

We know, as a matter of fact, these confessions are nearly always offered by the state in its case in chief, and the defendant is only required to come forward with his evidence on the admissibility of the confession when it is offered, leaving him free to introduce his evidence by which he attempts to establish his innocence when the state has rested.

Like my brethren who compose the majority, I do not want to hamper the officers of the law in bringing criminals to justice, but I feel they, like all others, should work within constitutional limitations and the laws of our state and nation.

The defendant should be granted a new trial.

For the reason stated, I dissent in part.

LUJAN, C. J., concurs.